# WITHROW *v.* WILLIAMS

No. 91–1030.   Argued November 3, 1992—Decided April 21, 1993

Souter, J., delivered the opinion for a unanimous Court with respect to Part III, and the opinion of the Court with respect to Parts I, II, and IV, in which White, Blackmun, Stevens, and Kennedy, JJ., joined. O'Connor, J., filed an opinion concurring in part and dissenting in part, in which Rehnquist, C. J., joined, *post*, p. 697. Scalia, J., filed an opinion concurring in part and dissenting in part, in which Thomas, J., joined, *post*, p. 715.

*Jeffrey Caminsky* argued the cause for petitioner. With him on the briefs were *John D. O'Hair* and *Timothy A. Baughman.*

*Deputy Solicitor General Roberts* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller,* and *Ronald J. Mann.*

*Seth P. Waxman,* by appointment of the Court, 504 U. S. 983, argued the cause for respondent. With him on the brief were *Scott L. Nelson* and *Daniel P. O'Neil.* *

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Donald E. De Nicola,*

JUSTICE SOUTER delivered the opinion of the Court.

In *Stone* v. *Powell,* 428 U. S. 465 (1976), we held that when a State has given a full and fair chance to litigate a Fourth Amendment claim, federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence

Deputy Attorney General, and *Mark L. Krotoski,* Special Assistant Attorney General, *James H. Evans,* Attorney General of Alabama, *Charles E. Cole,* Attorney General of Alaska, *Grant Woods,* Attorney General of Arizona, *Winston Bryant,* Attorney General of Arkansas, *Gale A. Norton,* Attorney General of Colorado, *Richard N. Palmer,* Chief State's Attorney of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, *Warren Price III,* Attorney General of Hawaii, *Larry EchoHawk,* Attorney General of Idaho, *Linley E. Pearson,* Attorney General of Indiana, *Robert T. Stephan,* Attorney General of Kansas, *Chris Gorman,* Attorney General of Kentucky, *Richard P. Ieyoub,* Attorney General of Louisiana, *Scott Harshbarger,* Attorney General of Massachusetts, *Michael C. Moore,* Attorney General of Mississippi, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *Don Stenberg,* Attorney General of Nebraska, *Frankie Sue Del Papa,* Attorney General of Nevada, *John P. Arnold,* Attorney General of New Hampshire, *Robert J. Del Tufo,* Attorney General of New Jersey, *Tom Udall,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, *Lee Fisher,* Attorney General of Ohio, *T. Travis Medlock,* Attorney General of South Carolina, *Mark W. Barnett,* Attorney General of South Dakota, *Charles W. Burson,* Attorney General of Tennessee, *R. Paul Van Dam,* Attorney General of Utah, *Jeffrey L. Amestoy,* Attorney General of Vermont, *Mary Sue Terry,* Attorney General of Virginia, *Kenneth O. Eikenberry,* Attorney General of Washington, *Mario J. Palumbo,* Attorney General of West Virginia, and *Joseph B. Meyer,* Attorney General of Wyoming; for Americans for Effective Law Enforcement, Inc., et al. by *Thomas J. Charron, Bernard J. Farber, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

*Larry W. Yackle, Steven R. Shapiro, Leslie A. Harris,* and *John A. Powell* filed a brief for the American Civil Liberties Union et al. as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the American Bar Association by *Talbot D'Alemberte* and *William J. Mertens;* and for the Police Foundation et al. by *Joseph D. Tydings* and *Michael Millemann.*

obtained through an unconstitutional search or seizure. Today we hold that *Stone*'s restriction on the exercise of federal habeas jurisdiction does not extend to a state prisoner's claim that his conviction rests on statements obtained in violation of the safeguards mandated by *Miranda* v. *Arizona*, 384 U. S. 436 (1966).

## I

Police officers in Romulus, Michigan, learned that respondent, Robert Allen Williams, Jr., might have information about a double murder committed on April 6, 1985. On April 10, two officers called at Williams's house and asked him to the police station for questioning. Williams agreed to go. The officers searched Williams, but did not handcuff him, and they all drove to the station in an unmarked car. One officer, Sergeant David Early, later testified that Williams was not under arrest at this time, although a contemporaneous police report indicates that the officers arrested Williams at his residence. App. 12a–13a, 24a–26a.

At the station, the officers questioned Williams about his knowledge of the crime. Although he first denied any involvement, he soon began to implicate himself, and the officers continued their questioning, assuring Williams that their only concern was the identity of the "shooter." After consulting each other, the officers decided not to advise Williams of his rights under *Miranda* v. *Arizona, supra.* See App. to Pet. for Cert. 48a. When Williams persisted in denying involvement, Sergeant Early reproved him:

> "You know everything that went down. You just don't want to talk about it. What it's gonna amount to is you can talk about it now and give us the truth and we're gonna check it out and see if it fits or else we're simply gonna charge you and lock you up and you can just tell it to a defense attorney and let him try and prove differently." *Ibid.*

The reproof apparently worked, for Williams then admitted he had furnished the murder weapon to the killer, who had called Williams after the crime and told him where he had discarded the weapon and other incriminating items. Williams maintained that he had not been present at the crime scene.

Only at this point, some 40 minutes after they began questioning him, did the officers advise Williams of his *Miranda* rights. Williams waived those rights and during subsequent questioning made several more inculpatory statements. Despite his prior denial, Williams admitted that he had driven the murderer to and from the scene of the crime, had witnessed the murders, and had helped the murderer dispose of incriminating evidence. The officers interrogated Williams again on April 11 and April 12, and, on April 12, the State formally charged him with murder.

Before trial, Williams moved to suppress his responses to the interrogations, and the trial court suppressed the statements of April 11 and April 12 as the products of improper delay in arraignment under Michigan law. See App. to Pet. for Cert. 90a–91a. The court declined to suppress the statements of April 10, however, ruling that the police had given Williams a timely warning of his *Miranda* rights. *Id.*, at 90a. A bench trial led to Williams's conviction on two counts each of first-degree murder and possession of a firearm during the commission of a felony and resulted in two concurrent life sentences. The Court of Appeals of Michigan affirmed the trial court's ruling on the April 10 statements, *People* v. *Williams*, 171 Mich. App. 234, 429 N. W. 2d 649 (1988), and the Supreme Court of Michigan denied leave to appeal, 432 Mich. 913, 440 N. W. 2d 416 (1989). We denied the ensuing petition for writ of certiorari. *Williams* v. *Michigan*, 493 U. S. 956 (1989).

Williams then began this action *pro se* by petitioning for a writ of habeas corpus in the District Court, alleging a violation of his *Miranda* rights as the principal ground for relief.

Petition for Writ of Habeas Corpus in No. 90CV–70256, p. 5 (ED Mich.). The District Court granted relief, finding that the police had placed Williams in custody for *Miranda* purposes when Sergeant Early had threatened to "lock [him] up," and that the trial court should accordingly have excluded all statements Williams had made between that point and his receipt of the *Miranda* warnings. App. to Pet. for Cert. 49a–52a. The court also concluded, though neither Williams nor petitioner had addressed the issue, that Williams's statements after receiving the *Miranda* warnings were involuntary under the Due Process Clause of the Fourteenth Amendment and thus likewise subject to suppression. App. to Pet. for Cert. 52a–71a. The court found that the totality of circumstances, including repeated promises of lenient treatment if he told the truth, had overborne Williams's will.[1]

The Court of Appeals affirmed, 944 F. 2d 284 (CA6 1991), holding the District Court correct in determining the police had subjected Williams to custodial interrogation before giving him the requisite *Miranda* advice, and in finding the statements made after receiving the *Miranda* warnings involuntary. *Id.*, at 289–290. The Court of Appeals summarily rejected the argument that the rule in *Stone* v. *Powell*, 428 U. S. 465 (1976), should apply to bar habeas review of Williams's *Miranda* claim. 944 F. 2d, at 291. We granted certiorari to resolve the significant issue thus presented. 503 U. S. 983 (1992).[2]

---

[1] The District Court mistakenly believed that the trial court had allowed the introduction of the statements Williams had made on April 12, and its ruling consequently extended to those statements as well. App. to Pet. for Cert. 72a–75a.

[2] JUSTICE SCALIA argues in effect that the rule in *Stone* v. *Powell*, 428 U. S. 465 (1976), should extend to all claims on federal habeas review. See *post*, at 719–720. With respect, that reasoning goes beyond the question on which we granted certiorari, Pet. for Cert. 1 ("where the premise of [a] Fifth Amendment ruling is a finding of a *Miranda* violation, where the petitioner has had one full and fair opportunity to raise the *Miranda* claim

## II

We have made it clear that *Stone*'s limitation on federal habeas relief was not jurisdictional in nature,[3] but rested on prudential concerns counseling against the application of the Fourth Amendment exclusionary rule on collateral review. See *Stone, supra*, at 494–495, n. 37; see also *Kuhlmann* v. *Wilson*, 477 U. S. 436, 447 (1986) (opinion of Powell, J.) (discussing equitable principles underlying *Stone*); *Kimmelman* v. *Morrison*, 477 U. S. 365, 379, n. 4 (1986); *Allen* v. *McCurry*, 449 U. S. 90, 103 (1980) (*Stone* concerns "the prudent exercise of federal-court jurisdiction under 28 U. S. C. § 2254"); cf. 28 U. S. C. § 2243 (court entertaining habeas petition shall "dispose of the matter as law and justice require"). We simply concluded in *Stone* that the costs of applying the exclusionary rule on collateral review outweighed any potential advantage to be gained by applying it there. *Stone, supra*, at 489–495.

We recognized that the exclusionary rule, held applicable to the States in *Mapp* v. *Ohio*, 367 U. S. 643 (1961), "is not a personal constitutional right"; it fails to redress "the injury to the privacy of the victim of the search or seizure" at issue, "for any '[r]eparation comes too late.' " *Stone, supra*, at 486 (quoting *Linkletter* v. *Walker*, 381 U. S. 618, 637 (1965)). The rule serves instead to deter future Fourth Amendment violations, and we reasoned that its application on collateral review would only marginally advance this interest in deterrence. *Stone*, 428 U. S., at 493. On the other side of the ledger, the costs of applying the exclusionary rule on habeas

---

in state court, should collateral review of the same claim on a habeas corpus petition be precluded?"), and we see no good reason to address it in this case.

[3] Title 28 U. S. C. § 2254(a) provides: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

were comparatively great. We reasoned that doing so would not only exclude reliable evidence and divert attention from the central question of guilt, but would also intrude upon the public interest in "'(i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded.'" *Id.*, at 491, n. 31 (quoting *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 259 (1973) (Powell, J., concurring)).

Over the years, we have repeatedly declined to extend the rule in *Stone* beyond its original bounds. In *Jackson* v. *Virginia*, 443 U. S. 307 (1979), for example, we denied a request to apply *Stone* to bar habeas consideration of a Fourteenth Amendment due process claim of insufficient evidence to support a state conviction. We stressed that the issue was "central to the basic question of guilt or innocence," *Jackson*, 443 U. S., at 323, unlike a claim that a state court had received evidence in violation of the Fourth Amendment exclusionary rule, and we found that to review such a claim on habeas imposed no great burdens on the federal courts. *Id.*, at 321–322.

After a like analysis, in *Rose* v. *Mitchell*, 443 U. S. 545 (1979), we decided against extending *Stone* to foreclose habeas review of an equal protection claim of racial discrimination in selecting a state grand-jury foreman. A charge that state adjudication had violated the direct command of the Fourteenth Amendment implicated the integrity of the judicial process, we reasoned, *Rose*, 443 U. S., at 563, and failed to raise the "federalism concerns" that had driven the Court in *Stone*. 443 U. S., at 562. Since federal courts had granted relief to state prisoners upon proof of forbidden discrimination for nearly a century, we concluded, "confirmation that habeas corpus remains an appropriate vehicle by which federal courts are to exercise their Fourteenth Amendment

responsibilities" would not likely raise tensions between the state and federal judicial systems. *Ibid.*

In a third instance, in *Kimmelman* v. *Morrison, supra,* we again declined to extend *Stone,* in that case to bar habeas review of certain claims of ineffective assistance of counsel under the Sixth Amendment. We explained that unlike the Fourth Amendment, which confers no "trial right," the Sixth confers a "fundamental right" on criminal defendants, one that "assures the fairness, and thus the legitimacy, of our adversary process." 477 U. S., at 374. We observed that because a violation of the right would often go unremedied except on collateral review, "restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation." *Id.,* at 378.

In this case, the argument for extending *Stone* again falls short.[4] To understand why, a brief review of the derivation of the *Miranda* safeguards, and the purposes they were designed to serve, is in order.

The Self-Incrimination Clause of the Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U. S. Const., Amdt. 5. In *Bram* v. *United States,* 168 U. S. 532 (1897), the Court held that the Clause barred the introduction in federal cases of involuntary confessions made in response to custodial interrogation. We did not recognize the Clause's applicability to state cases until 1964, however, see *Malloy* v. *Hogan,* 378 U. S. 1; and, over the course of 30 years, beginning with the decision in *Brown* v. *Mississippi,* 297 U. S. 278 (1936), we analyzed the admissibility of confessions in such cases as a question of due process under the Fourteenth Amendment. See Stone, The Miranda Doctrine in the Burger Court, 1977 S. Ct. Rev. 99, 101–102. Under this ap-

---

[4] We have in the past declined to address the application of *Stone* in this context. See, *e. g., Duckworth* v. *Eagan,* 492 U. S. 195, 201, n. 3 (1989); *Wainwright* v. *Sykes,* 433 U. S. 72, 87, n. 11 (1977).

proach, we examined the totality of circumstances to determine whether a confession had been " 'made freely, voluntarily and without compulsion or inducement of any sort.' " *Haynes* v. *Washington,* 373 U. S. 503, 513 (1963) (quoting *Wilson* v. *United States,* 162 U. S. 613, 623 (1896)); see also *Schneckloth* v. *Bustamonte, supra,* at 223–227 (discussing totality-of-circumstances approach). See generally 1 W. LaFave & J. Israel, Criminal Procedure § 6.2 (1984). Indeed, we continue to employ the totality-of-circumstances approach when addressing a claim that the introduction of an involuntary confession has violated due process. *E. g., Arizona* v. *Fulminante,* 499 U. S. 279 (1991); *Miller* v. *Fenton,* 474 U. S. 104, 109–110 (1985).

In *Malloy,* we recognized that the Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination, and thereby opened *Bram*'s doctrinal avenue for the analysis of state cases. So it was that two years later we held in *Miranda* that the privilege extended to state custodial interrogations. In *Miranda,* we spoke of the privilege as guaranteeing a person under interrogation "the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will,' " 384 U. S., at 460 (quoting *Malloy, supra,* at 8), and held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U. S., at 467. To counter these pressures we prescribed, absent "other fully effective means," the now-familiar measures in aid of a defendant's Fifth Amendment privilege:

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity

> to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.,* at 479.

Unless the prosecution can demonstrate the warnings and waiver as threshold matters, we held, it may not overcome an objection to the use at trial of statements obtained from the person in any ensuing custodial interrogation. See *ibid.;* cf. *Oregon* v. *Hass,* 420 U. S. 714, 721–723 (1975) (permitting use for impeachment purposes of statements taken in violation of *Miranda*).

Petitioner, supported by the United States as *amicus curiae,* argues that *Miranda*'s safeguards are not constitutional in character, but merely "prophylactic," and that in consequence habeas review should not extend to a claim that a state conviction rests on statements obtained in the absence of those safeguards. Brief for Petitioner 91–93; Brief for United States as *Amicus Curiae* 14–15. We accept petitioner's premise for purposes of this case, but not her conclusion.

The *Miranda* Court did of course caution that the Constitution requires no "particular solution for the inherent compulsions of the interrogation process," and left it open to a State to meet its burden by adopting "other procedures . . . at least as effective in apprising accused persons" of their rights. 384 U. S., at 467. The Court indeed acknowledged that, in barring introduction of a statement obtained without the required warnings, *Miranda* might exclude a confession that we would not condemn as "involuntary in traditional terms," *id.,* at 457, and for this reason we have sometimes called the *Miranda* safeguards "prophylactic" in nature. *E. g., Duckworth* v. *Eagan,* 492 U. S. 195, 203 (1989); *Connecticut* v. *Barrett,* 479 U. S. 523, 528 (1987); *Oregon* v. *Elstad,* 470 U. S. 298, 305 (1985); *New York* v. *Quarles,* 467 U. S. 649, 654 (1984); see *Michigan* v. *Tucker,* 417 U. S. 433, 444 (1974)

(*Miranda* Court "recognized that these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected"). But cf. *Quarles, supra,* at 660 (opinion of O'CONNOR, J.) (*Miranda* Court "held unconstitutional, because inherently compelled, the admission of statements derived from in-custody questioning not preceded by an explanation of the privilege against self-incrimination and the consequences of forgoing it"). Calling the *Miranda* safeguards "prophylactic," however, is a far cry from putting *Miranda* on all fours with *Mapp,* or from rendering *Miranda* subject to *Stone.*

As we explained in *Stone,* the *Mapp* rule "is not a personal constitutional right," but serves to deter future constitutional violations; although it mitigates the juridical consequences of invading the defendant's privacy, the exclusion of evidence at trial can do nothing to remedy the completed and wholly extrajudicial Fourth Amendment violation. *Stone,* 428 U. S., at 486. Nor can the *Mapp* rule be thought to enhance the soundness of the criminal process by improving the reliability of evidence introduced at trial. Quite the contrary, as we explained in *Stone,* the evidence excluded under *Mapp* "is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant." 428 U. S., at 490.

*Miranda* differs from *Mapp* in both respects. "Prophylactic" though it may be, in protecting a defendant's Fifth Amendment privilege against self-incrimination, *Miranda* safeguards "a fundamental *trial* right." *United States* v. *Verdugo-Urquidez,* 494 U. S. 259, 264 (1990) (emphasis added); cf. *Kimmelman,* 477 U. S., at 377 (*Stone* does not bar habeas review of claim that the personal trial right to effective assistance of counsel has been violated). The privilege embodies "principles of humanity and civil liberty, which had been secured in the mother country only after years of struggle," *Bram,* 168 U. S., at 544, and reflects

"many of our fundamental values and most noble aspirations: . . . our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load;' our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life;' our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'" *Murphy* v. *Waterfront Comm'n of New York Harbor,* 378 U. S. 52, 55 (1964) (citations omitted).

Nor does the Fifth Amendment "trial right" protected by *Miranda* serve some value necessarily divorced from the correct ascertainment of guilt. " '[A] system of criminal law enforcement which comes to depend on the "confession" will, in the long run, be less reliable and more subject to abuses' than a system relying on independent investigation." *Michigan* v. *Tucker, supra,* at 448, n. 23 (quoting *Escobedo* v. *Illinois,* 378 U. S. 478, 488–489 (1964)). By bracing against "the possibility of unreliable statements in every instance of incustody interrogation," *Miranda* serves to guard against "the use of unreliable statements at trial." *Johnson* v. *New Jersey,* 384 U. S. 719, 730 (1966); see also *Schneckloth,* 412 U. S., at 240 (*Miranda* "Court made it clear that the basis for decision was the need to protect the fairness of the trial itself"); Halpern, Federal Habeas Corpus and the *Mapp* Exclusionary Rule after *Stone* v. *Powell,* 82 Colum. L. Rev. 1, 40 (1982); cf. *Rose* v. *Mitchell,* 443 U. S. 545 (1979) (*Stone* does not bar habeas review of claim of racial discrimination

in selection of grand-jury foreman, as this claim goes to the integrity of the judicial process).

Finally, and most importantly, eliminating review of *Miranda* claims would not significantly benefit the federal courts in their exercise of habeas jurisdiction, or advance the cause of federalism in any substantial way. As one *amicus* concedes, eliminating habeas review of *Miranda* issues would not prevent a state prisoner from simply converting his barred *Miranda* claim into a due process claim that his conviction rested on an involuntary confession. See Brief for United States as *Amicus Curiae* 17. Indeed, although counsel could provide us with no empirical basis for projecting the consequence of adopting petitioner's position, see Tr. of Oral Arg. 9–11, 19–21, it seems reasonable to suppose that virtually all *Miranda* claims would simply be recast in this way.[5]

If that is so, the federal courts would certainly not have heard the last of *Miranda* on collateral review. Under the due process approach, as we have already seen, courts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion, *Colorado* v. *Connelly*, 479 U. S. 157, 167 (1986); the length of the interrogation, *Ashcraft* v. *Tennessee*, 322 U. S. 143, 153–154 (1944); its location, see *Reck* v. *Pate*, 367 U. S. 433, 441 (1961); its continuity, *Leyra* v. *Denno*, 347 U. S. 556, 561 (1954); the defendant's maturity, *Haley* v. *Ohio*, 332 U. S. 596, 599–601 (1948) (opinion of Douglas, J.); education, *Clewis* v. *Texas*, 386 U. S. 707, 712 (1967); physical condition, *Greenwald* v. *Wisconsin*, 390 U. S. 519, 520–521 (1968) *(per curiam);* and mental health, *Fikes* v. *Alabama*, 352 U. S. 191, 196 (1957). They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present

---

[5] JUSTICE O'CONNOR is confident that many such claims would be unjustified, see *post*, at 708–709, but that is beside the point. Justifiability is not much of a gatekeeper on habeas.

during custodial interrogation. *Haynes* v. *Washington,* 373 U. S. 503, 516–517 (1963); Brief for United States as *Amicus Curiae* 19, n. 17; see also *Schneckloth, supra,* at 226 (discussing factors). We could lock the front door against *Miranda,* but not the back.

We thus fail to see how abdicating *Miranda*'s bright-line (or, at least, brighter-line) rules in favor of an exhaustive totality-of-circumstances approach on habeas would do much of anything to lighten the burdens placed on busy federal courts. See P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 188 (3d ed. 1988, Supp. 1992); Halpern, *supra,* at 40; Schulhofer, Confessions and the Court, 79 Mich. L. Rev. 865, 891 (1981); see also *Quarles,* 467 U. S., at 664 (O'CONNOR, J., concurring in judgment in part and dissenting in part) (quoting *Fare* v. *Michael C.,* 439 U. S. 1310, 1314 (1978) (REHNQUIST, J., in chambers)) (*Miranda*'s " 'core virtue' " was " 'afford[ing] police and courts clear guidance on the manner in which to conduct a custodial investigation' "). We likewise fail to see how purporting to eliminate *Miranda* issues from federal habeas would go very far to relieve such tensions as *Miranda* may now raise between the two judicial systems. Relegation of habeas petitioners to straight involuntariness claims would not likely reduce the amount of litigation, and each such claim would in any event present a legal question requiring an "independent federal determination" on habeas. *Miller* v. *Fenton,* 474 U. S., at 112.

One might argue that tension results between the two judicial systems whenever a federal habeas court overturns a state conviction on finding that the state court let in a voluntary confession obtained by the police without the *Miranda* safeguards. And one would have to concede that this has occurred in the past, and doubtless will occur again. It is not reasonable, however, to expect such occurrences to be frequent enough to amount to a substantial cost of reviewing

*Miranda* claims on habeas or to raise federal-state tensions to an appreciable degree. See Tr. of Oral Arg. 11, 21. We must remember in this regard that *Miranda* came down some 27 years ago. In that time, law enforcement has grown in constitutional as well as technological sophistication, and there is little reason to believe that the police today are unable, or even generally unwilling, to satisfy *Miranda's* requirements. See *Quarles, supra,* at 663 (O'CONNOR, J., concurring in judgment in part and dissenting in part) (quoting *Rhode Island* v. *Innis,* 446 U. S. 291, 304 (1980) (Burger, C. J., concurring in judgment)) ("'meaning of *Miranda* has become reasonably clear and law enforcement practices have adjusted to its strictures'"); Schulhofer, Reconsidering *Miranda,* 54 U. Chi. L. Rev. 435, 455–457 (1987).[6] And if, finally, one should question the need for federal collateral review of requirements that merit such respect, the answer simply is that the respect is sustained in no small part by the existence of such review. "It is the occasional abuse that the federal writ of habeas corpus stands ready to correct." *Jackson,* 443 U. S., at 322.

## III

One final point should keep us only briefly. As he had done in his state appellate briefs, on habeas Williams raised only one claim going to the admissibility of his statements to the police: that the police had elicited those statements without satisfying the *Miranda* requirements. See *supra,* at 684. In her answer, petitioner addressed only that claim. See Brief in Support of Answer in No. 90CV–70256 DT, p. 3 (ED Mich.). The District Court, nonetheless, without an evidentiary hearing or even argument, went beyond the habeas petition and found the statements Williams made after re-

---

[6] It should indeed come as no surprise that one of the submissions arguing against the extension of *Stone* in this case comes to us from law enforcement organizations. See Brief for Police Foundation et al. as *Amici Curiae.*

ceiving the *Miranda* warnings to be involuntary under due process criteria. Before the Court of Appeals, petitioner objected to the District Court's due process enquiry on the ground that the habeas petition's reference to *Miranda* rights had given her insufficient notice to address a due process claim. Brief for Respondent-Appellant in No. 90–2289, p. 6 (CA6). Petitioner pursues the objection here. See Pet. for Cert. 1; Brief for Petitioner 14–15, n. 2.

Williams effectively concedes that his habeas petition raised no involuntariness claim, but he argues that the matter was tried by the implied consent of the parties under Federal Rule of Civil Procedure 15(b),[7] and that petitioner can demonstrate no prejudice from the District Court's action. See Brief for Respondent 41–42, n. 22. The record, however, reveals neither thought, word, nor deed of petitioner that could be taken as any sort of consent to the determination of an independent due process claim, and petitioner was manifestly prejudiced by the District Court's failure to afford her an opportunity to present evidence bearing on that claim's resolution. The District Court should not have addressed the involuntariness question in these circumstances.[8]

---

[7] The relevant part of Rule 15(b) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." See 28 U. S. C. § 2254 Rule 11 (application of Federal Rules of Civil Procedure to habeas petitions); 1 J. Liebman, Federal Habeas Corpus Practice and Procedure § 17.2 (1988) (Rule 15 applies in habeas actions).

[8] We need not address petitioner's arguments that Williams failed to exhaust the involuntariness claim in the state courts and that the District Court applied a new rule under *Teague* v. *Lane,* 489 U. S. 288 (1989). Of course, we also express no opinion on the merits of the involuntariness claim.

## IV

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.

Today the Court permits the federal courts to overturn on habeas the conviction of a double murderer, not on the basis of an inexorable constitutional or statutory command, but because it believes the result desirable from the standpoint of equity and judicial administration. Because the principles that inform our habeas jurisprudence—finality, federalism, and fairness—counsel decisively against the result the Court reaches, I respectfully dissent from this holding.

## I

The Court does not sit today in direct review of a state-court judgment of conviction. Rather, respondent seeks relief by collaterally attacking his conviction through the writ of habeas corpus. While petitions for the writ of habeas corpus are now commonplace—over 12,000 were filed in 1990, compared to 127 in 1941—their current ubiquity ought not detract from the writ's historic importance. See L. Mecham, Annual Report of the Director of the Administrative Office of the United States Courts 191 (1991) (1990 figures); *Fay* v. *Noia,* 372 U. S. 391, 446, n. 2 (1963) (Clark, J., dissenting) (1941 figures). "The Great Writ" can be traced through the common law to well before the founding of this Nation; its role as a "prompt and efficacious remedy for whatever society deems to be intolerable restraints" is beyond question. *Fay,* 372 U. S., at 401–402. As Justice Harlan explained:

"*Habeas corpus ad subjiciendum* is today, as it has always been, a fundamental safeguard against unlawful

custody. . . . Although the wording of earlier statutory provisions has been changed, the basic question before the court to which the writ is addressed has always been the same: in the language of the present statute, on the books since 1867, is the detention complained of 'in violation of the Constitution or laws or treaties of the United States'?" *Id.*, at 449 (dissenting opinion).

Nonetheless, we repeatedly have recognized that collateral attacks raise numerous concerns not present on direct review. Most profound is the effect on finality. It goes without saying that, at some point, judicial proceedings must draw to a close and the matter deemed conclusively resolved; no society can afford forever to question the correctness of its every judgment. "[T]he writ," however, "strikes at finality," *McCleskey* v. *Zant*, 499 U. S. 467, 491 (1991), depriving the criminal law "of much of its deterrent effect," *Teague* v. *Lane*, 489 U. S. 288, 309 (1989) (plurality opinion), and sometimes preventing the law's just application altogether, see *McCleskey, supra*, at 491. "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation." *Mackey* v. *United States*, 401 U. S. 667, 691 (1971) (Harlan, J., concurring in part and dissenting in part); see also *McCleskey, supra*, at 492.

In our federal system, state courts have primary responsibility for enforcing constitutional rules in their own criminal trials. When a case comes before the federal courts on habeas rather than on direct review, the judicial role is "significantly different." *Mackey, supra*, at 682 (Harlan, J., concurring in part and dissenting in part). Accord, *Teague, supra*, at 306–308. Most important here, federal courts on direct review adjudicate every issue of federal law properly presented; in contrast, "federal courts have never had a similar obligation on habeas corpus." *Mackey, supra*, at 682

(Harlan, J., concurring in part and dissenting in part). As the Court explains today, federal courts exercising their habeas powers may refuse to grant relief on certain claims because of "prudential concerns" such as equity and federalism. *Ante*, at 686. This follows not only from the express language of the habeas statute, which directs the federal courts to "dispose of [habeas petitions] as law and justice require," 28 U. S. C. § 2243, but from our precedents as well. In *Francis* v. *Henderson*, 425 U. S. 536 (1976), we stated that "[t]his Court has long recognized that in some circumstances considerations of comity and concerns for the orderly administration of criminal justice require a federal court to forgo the exercise of its habeas corpus power." *Id.*, at 539. Accord, *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 653–654 (1992) ("Whether [a] claim is framed as a habeas petition or as a [42 U. S. C.] § 1983 action, [what is sought is] an equitable remedy"; as a result, equity must be "take[n] into consideration"); *Fay* v. *Noia, supra*, at 438 ("[H]abeas corpus has traditionally been regarded as governed by equitable principles"); *Duckworth* v. *Eagan*, 492 U. S. 195, 213 (1989) (O'CONNOR, J., concurring) ("[T]he Court has long recognized that habeas corpus [is] governed by equitable principles" (internal quotation marks omitted)).

Concerns for equity and federalism resonate throughout our habeas jurisprudence. In 1886, only eight years after Congress gave the federal courts power to issue writs ordering the release of state prisoners, this Court explained that courts could accommodate federalism and comity concerns by withholding relief until after state proceedings had terminated. *Ex parte Royall*, 117 U. S. 241, 251–253. Accord, *Fay, supra*, at 418–419. More recently, we relied on those same concerns in holding that new constitutional rules of criminal procedure do not apply retroactively on habeas. *Teague, supra*, at 306. Our treatment of successive petitions and procedurally defaulted claims similarly is governed by equitable principles. *McCleskey*, 499 U. S., at 489–491

(successive petitions); *id.,* at 490 (procedurally defaulted claims); *Fay, supra,* at 438 (procedurally defaulted claims). Most telling of all, this Court continuously has recognized that the ultimate equity on the prisoner's side—a sufficient showing of actual innocence—is normally sufficient, standing alone, to outweigh other concerns and justify adjudication of the prisoner's constitutional claim. See *Sawyer* v. *Whitley,* 505 U. S. 333, 340–347 (1992) (actual innocence of penalty); *Murray* v. *Carrier,* 477 U. S. 478, 496 (1986) (federal courts may reach procedurally defaulted claims on a showing that a constitutional violation probably resulted in the conviction of an actually innocent person); *Kuhlmann* v. *Wilson,* 477 U. S. 436, 454 (1986) (colorable showing of actual innocence suffices to excuse successive claim); see also *Teague* v. *Lane, supra,* at 313 (where absence of procedure seriously diminishes the likelihood of an accurate conviction, a new rule requiring the procedure may be applied retroactively on habeas).

Nonetheless, decisions concerning the availability of habeas relief warrant restraint. Nowhere is the Court's restraint more evident than when it is asked to exclude a substantive category of issues from relitigation on habeas. Although we recognized the possibility of excluding certain types of claims long ago, see *Mackey, supra,* at 683 (Harlan, J., concurring in part and dissenting in part), only once has this Court found that the concerns of finality, federalism, and fairness supported such a result; that was in *Stone* v. *Powell,* 428 U. S. 465 (1976). *Ante,* at 686. Since then, the Court has refused to bar additional categories of claims on three different occasions. *Ante,* at 687–688.

Today we face the question whether *Stone* v. *Powell* should extend to bar claims on habeas that the prophylactic rule of *Miranda* v. *Arizona,* 384 U. S. 436 (1966), had been violated. Continuing the tradition of caution in this area, the Court answers that question in the negative. This time I must disagree. In my view, the "prudential concerns,"

*ante*, at 686, that inform our habeas jurisprudence counsel the exclusion of *Miranda* claims just as strongly as they did the exclusionary rule claims at issue in *Stone* itself.

## II

In *Stone*, the Court explained that the exclusionary rule of *Mapp* v. *Ohio*, 367 U. S. 643 (1961), was not an inevitable product of the Constitution but instead "'a judicially created remedy.'" *Stone, supra*, at 486 (quoting *United States* v. *Calandra*, 414 U. S. 338, 349 (1974)). By threatening to exclude highly probative and sometimes critical evidence, the exclusionary rule "is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their value system." *Stone*, 428 U. S., at 492. The deterrent effect is strong: Any transgression of the Fourth Amendment carries the risk that evidence will be excluded at trial. Nonetheless, this increased sensitivity to Fourth Amendment values carries a high cost. Exclusion not only deprives the jury of probative and sometimes dispositive evidence, but also "deflects the truthfinding process and often frees the guilty." *Id.*, at 490. When that happens, it is not just the executive or the judiciary but all of society that suffers: The executive suffers because the police lose their suspect and the prosecutor the case; the judiciary suffers because its processes are diverted from the central mission of ascertaining the truth; and society suffers because the populace again finds a guilty and potentially dangerous person in its midst, solely because a police officer bungled.

While that cost is considered acceptable when a case is on direct review, the balance shifts decisively once the case is on habeas. There is little marginal benefit to enforcing the exclusionary rule on habeas; the penalty of exclusion comes too late to produce a noticeable deterrent effect. *Id.*, at 493. Moreover, the rule "divert[s attention] from the ultimate question of guilt," squanders scarce federal judicial re-

sources, intrudes on the interest in finality, creates friction between the state and federal systems of justice, and upsets the "'constitutional balance upon which the doctrine of federalism is founded.'" *Id.*, at 490, 491, n. 31 (quoting *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 259 (1973) (Powell, J., concurring)). Because application of the exclusionary rule on habeas "offend[s] important principles of federalism and finality in the criminal law which have long informed the federal courts' exercise of habeas jurisdiction," *Duckworth*, 492 U. S., at 208 (O'CONNOR, J., concurring), we held in *Stone* that such claims would no longer be cognizable on habeas so long as the State already had provided the defendant with a full and fair opportunity to litigate.

I continue to believe that these same considerations apply to *Miranda* claims with equal, if not greater, force. See *Duckworth, supra*, at 209 (O'CONNOR, J., concurring). Like the suppression of the fruits of an illegal search or seizure, the exclusion of statements obtained in violation of *Miranda* is not constitutionally required. This Court repeatedly has held that *Miranda*'s warning requirement is not a dictate of the Fifth Amendment itself, but a prophylactic rule. See, *e. g., McNeil* v. *Wisconsin*, 501 U. S. 171, 176 (1991); *Michigan* v. *Harvey*, 494 U. S. 344, 350 (1990); *Duckworth, supra*, at 203; *New York* v. *Quarles*, 467 U. S. 649, 654 (1984); *Michigan* v. *Tucker*, 417 U. S. 433, 442–446 (1974). Because *Miranda* "sweeps more broadly than the Fifth Amendment itself," it excludes some confessions even though the Constitution would not. *Oregon* v. *Elstad*, 470 U. S. 298, 306 (1985). Indeed, "in the individual case, *Miranda*'s preventive medicine [often] provides a remedy even to the defendant who has suffered no identifiable constitutional harm." *Id.*, at 307.

*Miranda*'s overbreadth, of course, is not without justification. The exclusion of unwarned statements provides a strong incentive for the police to adopt "procedural safeguards," *Miranda*, 384 U. S., at 444, against the exaction of

compelled or involuntary statements. It also promotes institutional respect for constitutional values. But, like the exclusionary rule for illegally seized evidence, *Miranda*'s prophylactic rule does so at a substantial cost. Unlike involuntary or compelled statements—which are of dubious reliability and are therefore inadmissible for any purpose—confessions obtained in violation of *Miranda* are not necessarily untrustworthy. In fact, because *voluntary* statements are "trustworthy" even when obtained without proper warnings, *Johnson* v. *New Jersey*, 384 U. S. 719, 731 (1966), their suppression actually *impairs* the pursuit of truth by concealing probative information from the trier of fact. See *Harvey*, *supra*, at 350 (*Miranda* "result[s] in the exclusion of some voluntary and reliable statements"); *Elstad*, *supra*, at 312 (loss of "highly probative evidence of a voluntary confession" is a "high cost [for] law enforcement"); *McNeil*, *supra*, at 181 (because "the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good," the exclusion of such confessions renders society "the loser"); *Tucker*, *supra*, at 461 (WHITE, J., concurring in judgment) ("[H]aving relevant and probative testimony, not obtained by actual coercion . . . aid[s] in the pursuit of truth"); *Miranda*, *supra*, at 538 (WHITE, J., dissenting) ("Particularly when corroborated, . . . such [voluntary] confessions have the highest reliability and significantly contribute to the certitude with which we may believe the accused is guilty").

When the case is on direct review, that damage to the truth-seeking function is deemed an acceptable sacrifice for the deterrence and respect for constitutional values that the *Miranda* rule brings. But once a case is on collateral review, the balance between the costs and benefits shifts; the interests of federalism, finality, and fairness compel *Miranda*'s exclusion from habeas. The benefit of enforcing *Miranda* through habeas is marginal at best. To the extent *Miranda* ensures the exclusion of involuntary statements, that task can be performed more accurately by adjudicating

the voluntariness question directly. See *Johnson, supra,* at 730–731. And, to the extent exclusion of voluntary but unwarned confessions serves a deterrent function, "[t]he awarding of habeas relief years after conviction will often strike like lightning, and it is absurd to think that this added possibility . . . will have any appreciable effect on police training or behavior." *Duckworth, supra,* at 211 (O'CONNOR, J., concurring). Judge Friendly made precisely the same point 18 years earlier: "[T]he deterrent value of permitting collateral attack," he explained, "goes beyond the point of diminishing returns." Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 163 (1970).

Despite its meager benefits, the relitigation of *Miranda* claims on habeas imposes substantial costs. Just like the application of the exclusionary rule, application of *Miranda*'s prophylactic rule on habeas consumes scarce judicial resources on an issue unrelated to guilt or innocence. No less than the exclusionary rule, it undercuts finality. It creates tension between the state and federal courts. And it upsets the division of responsibilities that underlies our federal system. But most troubling of all, *Miranda*'s application on habeas sometimes precludes the just application of law altogether. The order excluding the statement will often be issued "years after trial, when a new trial may be a practical impossibility." *Duckworth,* 492 U. S., at 211 (O'CONNOR, J., concurring). Whether the Court admits it or not, the grim result of applying *Miranda* on habeas will be, time and time again, "the release of an admittedly guilty individual who may pose a continuing threat to society." *Ibid.*

Any rule that so demonstrably renders truth and society "the loser," *McNeil* v. *Wisconsin,* 501 U. S., at 181, " 'bear[s] a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness,' " *United States* v. *Leon,* 468 U. S. 897, 908, n. 6 (1984) (quoting *Illinois* v. *Gates,* 462 U. S. 213, 257–

258 (1983) (WHITE, J., concurring in judgment)). That burden is heavier still on collateral review. In light of the meager deterrent benefit it brings and the tremendous costs it imposes, in my view application of *Miranda*'s prophylactic rule on habeas "falls short" of justification. *Ante,* at 688.

## III

The Court identifies a number of differences that, in its view, distinguish this case from *Stone* v. *Powell.* *Ante,* at 691–695. I am sympathetic to the Court's concerns but find them misplaced nonetheless.

The first difference the Court identifies concerns the nature of the right protected. *Miranda,* the Court correctly points out, fosters Fifth Amendment, rather than Fourth Amendment, values. *Ante,* at 691. The Court then offers a defense of the Fifth Amendment, reminding us that it is " 'a fundamental *trial* right' " that reflects " 'principles of humanity and civil liberty' "; that it was secured " 'after years of struggle' "; and that it does not serve "some value necessarily divorced from the correct ascertainment of guilt." *Ante,* at 691–692 (quoting *United States* v. *Verdugo-Urquidez,* 494 U. S. 259, 364 (1990), and *Bram* v. *United States,* 168 U. S. 532, 544 (1897)). The Court's spirited defense of the Fifth Amendment is, of course, entirely beside the point. The question is not whether *true* Fifth Amendment claims—the extraction and use of *compelled* testimony—should be cognizable on habeas. It is whether violations of *Miranda*'s prophylactic rule, which excludes from trial voluntary confessions obtained without the benefit of *Miranda*'s now-familiar warnings, should be. The questions are not the same; nor are their answers.

To say that the Fifth Amendment is a " 'fundamental *trial* right,' " *ante,* at 691 (quoting *United States* v. *Verdugo-Urquidez, supra,* at 264), is thus both correct and irrelevant. *Miranda*'s warning requirement may bear many labels, but "fundamental trial right" is not among them. Long before

*Miranda* was decided, it was well established that the Fifth Amendment prohibited the introduction of compelled or involuntary confessions at trial. And long before *Miranda,* the courts enforced that prohibition by asking a simple and direct question: Was "the confession the product of an essentially free and unconstrained choice," or was the defendant's will "overborne"? *Schneckloth* v. *Bustamonte,* 412 U. S., at 225 (quoting *Culombe* v. *Connecticut,* 367 U. S. 568, 602 (1961)); see *ante,* at 688–689; see, *e. g., Bram* v. *United States, supra. Miranda*'s innovation was its introduction of the warning requirement: It commanded the police to issue warnings (or establish other procedural safeguards) before obtaining a statement through custodial interrogation. And it backed that prophylactic rule with a similarly prophylactic remedy—the requirement that unwarned custodial statements, even if wholly voluntary, be excluded at trial. *Miranda,* 384 U. S., at 444. Excluding violations of *Miranda*'s prophylactic suppression requirement from habeas would not leave true Fifth Amendment violations unredressed. Prisoners still would be able to seek relief by "invok[ing] a substantive test of voluntariness" or demonstrating prohibited coercion directly. *Johnson,* 384 U. S., at 730; *Elstad,* 470 U. S., at 307–308 (statements falling outside *Miranda*'s sweep analyzed under voluntariness standard). The Court concedes as much. *Ante,* at 693 ("[E]liminating habeas review of *Miranda* issues would not prevent a state prisoner from simply converting his barred *Miranda* claim into a due process claim that his conviction rested on an involuntary confession").

Excluding *Miranda* claims from habeas, then, denies collateral relief only in those cases in which the prisoner's statement was neither compelled nor involuntary but merely obtained without the benefit of *Miranda*'s prophylactic warnings. The availability of a suppression remedy in such cases cannot be labeled a "fundamental trial right," for there is no constitutional right to the suppression of *voluntary* state-

ments. Quite the opposite: The Fifth Amendment, by its terms, prohibits only *compelled* self-incrimination; it makes no mention of "unwarned" statements. U. S. Const., Amdt. 5 ("No person . . . shall be *compelled* in any criminal case to be a witness against himself" (emphasis added)). On that much, our cases could not be clearer. See, *e. g., Michigan* v. *Tucker,* 417 U. S., at 448 ("Cases which involve the Self-Incrimination Clause must, by definition, involve an element of coercion, since the Clause provides only that a person shall not be *compelled* to give evidence against himself"); see *Elstad, supra,* at 306–307; *New York* v. *Quarles,* 467 U. S., at 654–655, and n. 5. As a result, the failure to issue warnings does "not abridge [the] constitutional privilege against compulsory self-incrimination, but depart[s] only from the prophylactic standards later laid down by this Court in *Miranda." Tucker, supra,* at 446. If the principles of federalism, finality, and fairness ever counsel in favor of withholding relief on habeas, surely they do so where there is no constitutional harm to remedy.

Similarly unpersuasive is the Court's related argument, *ante,* at 692, that the Fifth Amendment trial right is not "necessarily divorced" from the interest of reliability. Whatever the Fifth Amendment's relationship to reliability, *Miranda*'s prophylactic rule is not merely "divorced" from the quest for truth but at war with it as well. The absence of *Miranda* warnings does not by some mysterious alchemy convert a voluntary and trustworthy statement into an involuntary and unreliable one. To suggest otherwise is both unrealistic and contrary to precedent. As I explained above, we have held over and over again that the exclusion of unwarned but voluntary statements not only fails to advance the cause of accuracy but impedes it by depriving the jury of trustworthy evidence. *Supra,* at 703. In fact, we have determined that the damage *Miranda* does to the truth-seeking mission of the criminal trial can become intolerable. We therefore have limited the extent of the suppression rem-

edy, see *Harris* v. *New York*, 401 U. S. 222, 224–226 (1971) (unwarned but voluntary statement may be used for impeachment), and dispensed with it entirely elsewhere, see *Quarles, supra* (unwarned statement may be used for any purpose where statement was obtained under exigent circumstances bearing on public safety). And at least one Member of this Court dissented from *Miranda* itself because it "establish[ed] a new . . . barrier to the ascertainment of truth by the judicial process." *Miranda, supra*, at 542 (opinion of WHITE, J.). Consequently, I agree with the Court that *Miranda*'s relationship to accurate verdicts is an important consideration when deciding whether to permit *Miranda* claims on habeas. But it is a consideration that weighs decisively *against* the Court's decision today.

The consideration the Court identifies as being "most importan[t]" of all, *ante*, at 693, is an entirely pragmatic one. Specifically, the Court "project[s]" that excluding *Miranda* questions from habeas will not significantly promote efficiency or federalism because some *Miranda* issues are relevant to a statement's voluntariness. *Ante*, at 693–695. It is true that barring *Miranda* claims from habeas poses no barrier to the adjudication of voluntariness questions. But that does not make it "reasonable to suppose that virtually all *Miranda* claims [will] simply be recast" and litigated as voluntariness claims. *Ante*, at 693. Involuntariness requires coercive state action, such as trickery, psychological pressure, or mistreatment. *Colorado* v. *Connelly*, 479 U. S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); *ante*, at 693 (referring to "the crucial element of police coercion"). A *Miranda* claim, by contrast, requires no evidence of police overreaching whatsoever; it is enough that law enforcement officers commit a technical error. Even the forgetful failure to issue warnings to the most wary, knowledgeable, and sea-

soned of criminals will do. *Miranda*, 384 U. S., at 468 ("[W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given"). Given the Court's unqualified trust in the willingness of police officers to satisfy *Miranda's* requirements, *ante*, at 695, its suggestion that their every failure to do so involves coercion seems to me ironic. If the police have truly grown in "constitutional . . . sophistication," *ibid.*, then certainly it is reasonable to suppose that most technical errors in the administration of *Miranda's* warnings are just that.

In any event, I see no need to resort to supposition. The published decisions of the lower federal courts show that what the Court assumes to be true demonstrably is not. In case after case, the courts are asked on habeas to decide purely technical *Miranda* questions that contain not even a hint of police overreaching. And in case after case, no voluntariness issue is raised, primarily because none exists. Whether the suspect was in "custody," [1] whether or not there

---

[1] See, *e. g., Schiro* v. *Clark*, 963 F. 2d 962, 974–975 (CA7 1992) (defendant approached officer in halfway house and asked to speak to him; not in custody); *Tart* v. *Massachusetts*, 949 F. 2d 490, 504 (CA1 1991) (fisherman asked to produce document on board his own, docked boat; no custody); *Williams* v. *Chrans*, 945 F. 2d 926, 950–952 (CA7 1991) (voluntary appearance for presentence report interview; not in custody), cert. denied, 505 U. S. 1208 (1992); *Carlson* v. *State*, 945 F. 2d 1026, 1028–1029 (CA8 1991) (suspect questioned at his home; no custody); *Davis* v. *Kemp*, 829 F. 2d 1522, 1535 (CA11 1987) (defendant voluntarily went to police station in absence of evidence that there was probable cause for arrest; not in custody), cert. denied, 485 U. S. 929 (1988); *Cobb* v. *Perini*, 832 F. 2d 342, 345–347 (CA6 1987) (investigatory *Terry*-stop; not in custody), cert. denied, 486 U. S. 1024 (1988); *Leviston* v. *Black*, 843 F. 2d 302, 304 (CA8) (in-jail interview initiated by incarcerated defendant; no custody), cert. denied, 488 U. S. 865 (1988); *Cordoba* v. *Hanrahan*, 910 F. 2d 691, 693–694 (CA10) (drunk driver questioned at accident scene before arrest; not in custody), cert. denied, 498 U. S. 1014 (1990).

was "interrogation,"[2] whether warnings were given or were adequate,[3] whether the defendant's equivocal statement constituted an invocation of rights,[4] whether waiver was knowing and intelligent[5]—this is the stuff that *Miranda* claims are made of. While these questions create litigable issues under *Miranda*, they generally do not indicate the existence of coercion—pressure tactics, deprivations, or exploitations of the defendant's weaknesses—sufficient to establish involuntariness.

[2] See, *e. g., Endress* v. *Dugger,* 880 F. 2d 1244, 1246–1250 (CA11 1989) (defendant volunteered information without questioning), cert. denied, 495 U. S. 904 (1990); *United States ex rel. Church* v. *De Robertis,* 771 F. 2d 1015, 1018–1020 (CA7 1985) (placing defendant's brother in cell with him not interrogation); *Harryman* v. *Estelle,* 616 F. 2d 870, 873–875 (CA5) (en banc) (officer's surprised exclamation, "What is this?" upon finding condom filled with white powder, constituted interrogation), cert. denied, 449 U. S. 860 (1980); *Phillips* v. *Attorney General of California,* 594 F. 2d 1288, 1290–1291 (CA9 1979) (defendant volunteered information after officer stated that he wished to see interior of defendant's plane).

[3] See. *e. g., Chambers* v. *Lockhart,* 872 F. 2d 274, 275–276 (CA8) (omission of right to free appointed counsel), cert. denied, 493 U. S. 938 (1989); *Gates* v. *Zant,* 863 F. 2d 1492, 1500–1501 (CA11) (no warning that videotape of confession could be used), cert. denied, 493 U. S. 945 (1989); *Crespo* v. *Armontrout,* 818 F. 2d 684, 685–686 (CA8) (when and whether warnings were given), cert. denied, 484 U. S. 978 (1987); *De La Rosa* v. *Texas,* 743 F. 2d 299, 301–302 (CA5 1984) (officer's explanation of the warnings alleged to be misleading), cert. denied, 470 U. S. 1065 (1985); *Stanley* v. *Zant,* 697 F. 2d 955, 972 (CA11 1983) (allegedly misleading waiver form), cert. denied, 467 U. S. 1219 (1984).

[4] See, *e. g., Bobo* v. *Kolb,* 969 F. 2d 391, 395–398 (CA7 1992) (standing mute); *Christopher* v. *Florida,* 824 F. 2d 836, 841–843 (CA11 1987) (equivocal invocation of right to silence), cert. denied, 484 U. S. 1077–1078 (1988); *Lightbourne* v. *Dugger,* 829 F. 2d 1012, 1017–1019 (CA11 1987) (spontaneous resumption of discussion after cutting off questioning), cert. denied, 488 U. S. 934 (1988).

[5] See, *e. g., Terrovona* v. *Kincheloe,* 912 F. 2d 1176, 1179–1180 (CA9 1990) (validity of implied waiver in light of defendant's "background, experience, and conduct"), cert. denied, 499 U. S. 979 (1991); *Fike* v. *James,* 833 F. 2d 1503, 1506–1507 (CA11 1987) (defendant's initiation of contact waived previous invocation of rights).

Even assuming that many *Miranda* claims could "simply be recast" as voluntariness claims, it does not follow that barring *Miranda*'s prophylactic rule from habeas would unduly complicate their resolution. The Court labels *Miranda* a "bright-line (or, at least, brighter-line) rul[e]" and involuntariness an "exhaustive totality-of-circumstances approach," *ante*, at 694, but surely those labels overstate the differences. *Miranda*, for all its alleged brightness, is not without its difficulties; and voluntariness is not without its strengths. JUSTICE WHITE so observed in his *Miranda* dissent, noting that the Court could not claim that

> "judicial time and effort . . . will be conserved because of the ease of application of the *[Miranda]* rule. *[Miranda]* leaves open such questions as whether the accused was in custody, whether his statements were spontaneous or the product of interrogation, whether the accused has effectively waived his rights, . . . all of which are certain to prove productive of uncertainty during investigation and litigation during prosecution." *Miranda, supra*, at 544–545.

Experience has proved JUSTICE WHITE's prediction correct. *Miranda* creates as many close questions as it resolves. The task of determining whether a defendant is in "custody" has proved to be "a slippery one." *Elstad*, 470 U. S., at 309; see, *e. g.*, n. 1, *supra* (custody cases). And the supposedly "bright" lines that separate interrogation from spontaneous declaration, the exercise of a right from waiver, and the adequate warning from the inadequate, likewise have turned out to be rather dim and ill defined. See *Rhode Island* v. *Innis*, 446 U. S. 291 (1980) (interrogation); n. 2, *supra* (interrogation); nn. 4 and 5, *supra* (waiver and invocation); n. 3, *supra* (adequacy of warnings). Yet *Miranda* requires those lines to be drawn with precision in each case.

The totality-of-the-circumstances approach, on the other hand, permits each fact to be taken into account without re-

sort to formal and dispositive labels. By dispensing with the difficulty of producing a yes-or-no answer to questions that are often better answered in shades and degrees, the voluntariness inquiry often can make judicial decisionmaking easier rather than more onerous. Thus, it is true that the existence of warnings is still a consideration under the totality-of-the-circumstances approach, *ante*, at 693–694, but it is unnecessary to determine conclusively whether "custody" existed and triggered the warning requirement, or whether the warnings given were sufficient. It is enough that the habeas court look to the warnings or their absence, along with all other factors, and consider them in deciding what is, after all, the ultimate question: whether the confession was compelled and involuntary or the product of a free and unimpaired will. See *Schneckloth* v. *Bustamonte*, 412 U. S., at 225–226.

Nor does continued application of *Miranda*'s prophylactic rule on habeas dispense with the necessity of testing confessions for voluntariness. While *Miranda*'s conclusive presumption of coercion may sound like an impenetrable barrier to the introduction of compelled testimony, in practice it leaks like a sieve. *Miranda*, for example, does not preclude the use of an unwarned confession outside the prosecution's case in chief, *Harris* v. *New York*, 401 U. S. 222 (1971); *Oregon* v. *Hass*, 420 U. S. 714 (1975); involuntary statements, by contrast, must be excluded from trial for all purposes, *Mincey* v. *Arizona*, 437 U. S. 385, 398 (1978). *Miranda* does not preclude admission of the fruits of an unwarned statement, see *Oregon* v. *Elstad*, *supra;* but under the Fifth and Fourteenth Amendments, we require the suppression of not only compelled confessions but tainted subsequent confessions as well, *Clewis* v. *Texas*, 386 U. S. 707, 710 (1967). Finally, *Miranda* can fail to exclude some truly involuntary statements: It is entirely possible to extract a compelled statement despite the most precise and accurate of warnings.

See *Johnson*, 384 U. S., at 730 (warnings are only one factor in determining voluntariness).

The Court's final rationale is that, because the federal courts rarely issue writs for *Miranda* violations, eliminating *Miranda* claims from *habeas* will not decrease state-federal tensions to an appreciable degree. *Ante*, at 694–695. The relative infrequency of relief, however, does not diminish the intrusion on state sovereignty; it diminishes only our justification for intruding in the first place. After all, even if relief is denied at the end of the day, the State still must divert its scarce prosecutorial resources to defend an otherwise final conviction. If relief is truly rare, efficiency counsels in favor of dispensing with the search for the prophylactic rule violation in a haystack; instead, the federal courts should concentrate on the search for true Fifth Amendment violations by adjudicating the questions of voluntariness and compulsion directly. I therefore find it of little moment that the Police Foundation et al. support respondent. *Ante*, at 695, n. 6. Those who bear the primary burden of defending state convictions in federal courts—including 36 States and the National District Attorneys Association— resoundingly support the opposite side. See Brief for California et al. as *Amici Curiae*; Brief for Americans for Effective Law Enforcement, Inc., and the National District Attorneys Association, Inc., as *Amici Curiae*; see also Brief for United States as *Amicus Curiae* (United States must defend against claims raised by federal prisoners under 28 U. S. C. § 2255).

The Court's response, that perhaps the police respect the *Miranda* rule as a result of "the existence of [habeas] review," *ante*, at 695, is contrary to both case law and common sense. As explained above, there is simply no reason to think that habeas relief, which often "'strike[s] like lightning'" years after conviction, contributes much additional deterrence beyond the threat of exclusion during state proceedings. See *supra*, at 704 (quoting *Duckworth*, 492 U. S., at 211 (O'CONNOR, J., concurring)). Accord, Friendly, 38

U. Chi. L. Rev., at 163.   And our decision in *Stone* expressly so held: "The view that the deterrence . . . would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws . . . that went undetected at trial and on appeal." 428 U. S., at 493 (footnote omitted).   The majority offers no justification for disregarding our decision in *Stone;* nor does it provide any reason to question the truth of *Stone's* observation.

## IV

As the Court emphasizes today, *Miranda's* prophylactic rule is now 27 years old; the police and the state courts have indeed grown accustomed to it.   *Ante,* at 695.   But it is precisely because the rule is well accepted that there is little further benefit to e iforcing it on habeas.   We can depend on law enforcement of icials to administer warnings in the first instance and the sta te courts to provide a remedy when law enforcement officer: err.   None of the Court's asserted justifications for enforc ng *Miranda's* prophylactic rule through habeas—neither reverence for the Fifth Amendment nor the concerns of reliability, efficiency, and federalism—counsel in favor of the Court's chosen course.   Indeed, in my view they cut in precisely the opposite direction.   The Court may reconsider its decision when presented with empirical data. See *ante,* at 693 (noting absence of empirical data); *ante,* at 688 (holding only that today's *argument* in favor of extending *Stone* "falls short").   But I see little reason for such a costly delay.   Logic and experience are at our disposal now.   And they amply demonstrate that applying *Miranda's* prophylactic rule on habeas does not increase the amount of justice dispensed; it only increases the frequency with which the admittedly guilty go free.   In my view, *Miranda* imposes such grave costs and produces so little benefit on habeas that its continued application is neither tolerable nor justified. Accordingly, I join Part III of the Court's opinion but respectfully dissent from the remainder.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in part and dissenting in part.

The issue in this case—whether the extraordinary remedy of federal habeas corpus should routinely be available for claimed violations of *Miranda* rights—involves not *jurisdiction* to issue the writ, but the *equity* of doing so. In my view, both the Court and JUSTICE O'CONNOR disregard the most powerful equitable consideration: that Williams has already had full and fair opportunity to litigate this claim. He had the opportunity to raise it in the Michigan trial court; he did so and lost. He had the opportunity to seek review of the trial court's judgment in the Michigan Court of Appeals; he did so and lost. Finally, he had the opportunity to seek discretionary review of that Court of Appeals judgment in both the Michigan Supreme Court and this Court; he did so and review was denied. The question at this stage is whether, given all that, a federal habeas court should now reopen the issue and adjudicate the *Miranda* claim anew. The answer seems to me obvious: it should not. That would be the course followed by a federal habeas court reviewing a *federal* conviction; it mocks our federal system to accord state convictions less respect.

## I

By statute, a federal habeas court has jurisdiction over any claim that a prisoner is "in custody in violation of the Constitution or laws" of the United States. See 28 U. S. C. §§ 2241(c)(3), 2254(a), 2255. While that jurisdiction does require a claim of legal error in the original proceedings, cf. *Herrera* v. *Collins*, 506 U. S. 390 (1993), it is otherwise sweeping in its breadth. As early as 1868, this Court described it in these terms:

> "This legislation is of the most comprehensive character. It brings within the *habeas corpus* jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the National Constitu-

tion, treaties, or laws. It is impossible to widen this jurisdiction." *Ex parte McCardle,* 6 Wall. 318, 325–326 (1868).

Our later case law has confirmed that assessment. Habeas jurisdiction extends, we have held, to federal claims for which an opportunity for full and fair litigation has already been provided in state or federal court, see *Brown* v. *Allen,* 344 U. S. 443, 458–459 (1953); *Kaufman* v. *United States,* 394 U. S. 217, 223–224 (1969), to procedurally defaulted federal claims, including those over which this Court would have no jurisdiction on direct review, see *Fay* v. *Noia,* 372 U. S. 391, 426, 428–429 (1963); *Kaufman, supra,* at 223; *Wainwright* v. *Sykes,* 433 U. S. 72, 90–91 (1977); *Coleman* v. *Thompson,* 501 U. S. 722, 750 (1991), and to federal claims of a state criminal defendant awaiting trial, see *Ex parte Royall,* 117 U. S. 241, 251 (1886).

But with great power comes great responsibility. Habeas jurisdiction is tempered by the restraints that accompany the exercise of equitable discretion. This is evident from the text of the federal habeas statute, which provides that writs of habeas corpus "*may* be granted"—not that they *shall* be granted—and enjoins the court to "dispose of the matter as law *and justice* require." 28 U. S. C. §§ 2241(a), 2243 (emphases added). That acknowledgment of discretion is merely the continuation of a long historic tradition. In English law, habeas corpus was one of the so-called "prerogative" writs, which included the writs of mandamus, certiorari, and prohibition. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame, 53 N. Y. U. L. Rev. 983, 984, n. 2 (1978); 3 W. Blackstone, Commentaries 132 (1768). "[A]s in the case of all other prerogative writs," habeas would not issue "as of mere course," but rather required a showing "why the extraordinary power of the crown is called in to the party's assistance." *Ibid.* And even where the writ was issued to compel production of the

prisoner in court, the standard applied to determine whether relief would be accorded was equitable: The court was to "determine whether the case of [the prisoner's] commitment be just, and thereupon do as to justice shall appertain." 1 *id.*, at 131.

This Court has frequently rested its habeas decisions on equitable principles. In one of the earliest federal habeas cases, *Ex parte Watkins*, 3 Pet. 193, 201 (1830), Chief Justice Marshall wrote: "No doubt exists respecting the power [of the Court to issue the writ]; the question is, whether this be a case in which it ought to be exercised." And in *Ex parte Royall*, the Court, while affirming that a federal habeas court had "the power" to discharge a state prisoner awaiting trial, held that it was "not bound in every case to exercise such a power." 117 U. S., at 251. The federal habeas statute did "not deprive the court of discretion," which "should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States." *Ibid.*

This doctrine continues to be reflected in our modern cases. In declining to extend habeas relief to all cases of state procedural default, the Court in *Fay* v. *Noia* said: "Discretion is implicit in the statutory command that the judge . . . 'dispose of the matter as law and justice require,' 28 U. S. C. § 2243; and discretion was the flexible concept employed by the federal courts in developing the exhaustion rule." 372 U. S., at 438. See also *Wainwright* v. *Sykes, supra*, at 88. In fashioning this Court's retroactivity doctrine, the plurality in *Teague* v. *Lane*, 489 U. S. 288, 308–310 (1989), also relied on equitable considerations. And in a case announced today, holding that the harmless-error standard for habeas corpus is less onerous than the one for direct review, the Court carries on this tradition by expressly considering equitable principles such as "finality," "comity," and "federalism." *Brecht* v. *Abrahamson, ante*, at 635–636.

Indeed, as JUSTICE O'CONNOR notes, this Court's jurisprudence has defined the scope of habeas corpus largely by means of such equitable principles. See *ante*, at 698–700 (opinion concurring in part and dissenting in part). The use of these principles, which serve as "gateway[s]" through which a habeas petitioner must pass before proceeding to the merits of a constitutional claim, "is grounded in the 'equitable discretion' of habeas courts." *Herrera* v. *Collins, supra,* at 404.

## II

As the Court today acknowledges, see *ante*, at 686–687, the rule of *Stone* v. *Powell,* 428 U. S. 465 (1976), is simply one application of equitable discretion. It does not deny a federal habeas court jurisdiction over Fourth Amendment claims, but merely holds that the court ought not to entertain them when the petitioner has already had an opportunity to litigate them fully and fairly. See *id.,* at 495, n. 37. It is therefore not correct to say that applying *Stone* to the present case involves "eliminating review of *Miranda* claims" from federal habeas, *ante*, at 693, or that the Court is being "asked to exclude a substantive category of issues from relitigation on habeas," *ante*, at 700 (O'CONNOR, J., concurring in part and dissenting in part). And it is therefore unnecessary to discuss at length the value of *Miranda* rights, as though it has been proposed that since they are particularly worthless they deserve specially disfavored treatment. The proposed rule would treat *Miranda* claims no differently from *all other claims*, taking account of all equitable factors, including the opportunity for full and fair litigation, in determining whether to provide habeas review. Wherein *Miranda* and Fourth Amendment claims differ from some other claims, is that the most significant countervailing equitable factor (possibility that the assigned error produced the conviction of an innocent person) will ordinarily not exist.

At common law, the opportunity for full and fair litigation of an issue at trial and (if available) direct appeal was not

only *a* factor weighing against reaching the merits of an issue on habeas; it was a *conclusive* factor, unless the issue was a legal issue going to the jurisdiction of the trial court. See *Ex parte Watkins, supra,* at 202–203; W. Church, Habeas Corpus § 363 (1884). Beginning in the late 19th century, however, that rule was gradually relaxed, by the device of holding that various illegalities deprived the trial court of jurisdiction. See, *e. g., Ex parte Lange,* 18 Wall. 163, 176 (1874) (no jurisdiction to impose second sentence in violation of Double Jeopardy Clause); *Ex parte Siebold,* 100 U. S. 371, 376–377 (1880) (no jurisdiction to try defendant for violation of unconstitutional statute); *Frank* v. *Mangum,* 237 U. S. 309 (1915) (no jurisdiction to conduct trial in atmosphere of mob domination); *Moore* v. *Dempsey,* 261 U. S. 86 (1923) (same); *Johnson* v. *Zerbst,* 304 U. S. 458, 468 (1938) (no jurisdiction to conduct trial that violated defendant's Sixth Amendment right to counsel). See generally *Wright* v. *West,* 505 U. S. 277, 285–286 (1992) (opinion of THOMAS, J.); *Fay, supra,* at 450–451 (Harlan, J., dissenting). Finally, the jurisdictional line was openly abandoned in *Waley* v. *Johnston,* 316 U. S. 101, 104–105 (1942). See P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1502 (3d ed. 1988) (hereinafter Hart and Wechsler).

But to say that prior opportunity for full and fair litigation no longer *automatically* precludes from consideration even nonjurisdictional issues is not to say that such prior opportunity is no longer a relevant equitable factor. Reason would suggest that it must be, and *Stone* v. *Powell, supra,* establishes that it is. Thus, the question before us is not whether a holding unique to Fourth Amendment claims (and resting upon nothing more principled than our estimation that Fourth Amendment exclusion claims are not very important) should be expanded to some other arbitrary category beyond that; but rather, whether the general principle that is the only valid justification for *Stone* v. *Powell* should for some

reason *not* be applied to *Miranda* claims. I think the answer to that question is clear: Prior opportunity to litigate an issue should be an important equitable consideration in *any* habeas case, and should ordinarily preclude the court from reaching the merits of a claim, unless it goes to the fairness of the trial process or to the accuracy of the ultimate result.

Our case law since *Stone* is entirely consistent with this view. As the Court notes, *ante*, at 687–688, we have held that the rule in *Stone* does not apply in three cases. *Kimmelman* v. *Morrison*, 477 U. S. 365 (1986), involved alleged denial of the Sixth Amendment right to counsel, which unquestionably goes to the fairness of the trial process. *Rose* v. *Mitchell*, 443 U. S. 545 (1979), involved alleged discrimination by the trial court in violation of the Fourteenth Amendment. We concluded that since the "same trial court will be the court that initially must decide the merits of such a claim," and since the claim involved an assertion that "the state judiciary itself has purposely violated the Equal Protection Clause," no opportunity for a full and fair state hearing existed. *Id.*, at 561; see also *id.*, at 563. And *Jackson* v. *Virginia*, 443 U. S. 307 (1979), involved a claim that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt," *id.*, at 324, which is obviously a direct challenge to the accuracy of the ultimate result.

## III

The rule described above—or indeed a rule even somewhat more limiting of habeas review than that—is followed in federal postconviction review of *federal* convictions under 28 U. S. C. § 2255. In *Kaufman* v. *United States*, 394 U. S. 217 (1969), which held that res judicata does not bar § 2255 habeas review of constitutional issues, we stated that a district court had "discretion" to refuse to reach the merits of a constitutional claim that had already been raised and resolved against the prisoner at trial and on direct review.

*Id.*, at 227, n. 8. Since *Kaufman*, federal courts have uniformly held that, absent countervailing considerations, district courts may refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal. See, *e. g., Giacalone* v. *United States*, 739 F. 2d 40, 42–43 (CA2 1984); *United States* v. *Orejuela*, 639 F. 2d 1055, 1057 (CA3 1981); *Stephan* v. *United States*, 496 F. 2d 527, 528–529 (CA6 1974), cert. denied *sub nom. Marchesani* v. *United States*, 423 U. S. 861 (1975); see also 3 C. Wright, Federal Practice and Procedure § 593, p. 439, n. 26 (1982); Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1064–1066 (1970). Thus, a prior opportunity for full and fair litigation is normally dispositive of a federal prisoner's habeas claim. If the claim was raised and rejected on direct review, the habeas court will not readjudicate it absent countervailing equitable considerations; if the claim was not raised, it is procedurally defaulted and the habeas court will not adjudicate it absent countervailing equitable considerations (*e. g.*, actual innocence or cause and prejudice, see *United States* v. *Frady*, 456 U. S. 152 (1982)).

Because lower federal courts have not generally recognized their discretion to deny habeas relief in state cases where opportunity for full and fair litigation was accorded, the peculiar state of current federal habeas practice is this: State courts routinely see their criminal convictions vacated by federal district judges, but federal courts see their criminal convictions afforded a substantial measure of finality and respect. See Hart and Wechsler 1585. Only one theory can possibly justify this disparity—the theory advanced in *Fay* v. *Noia*, that a federal forum must be afforded for every federal claim of a state criminal defendant.* See 372 U. S., at

---

*Of course a federal forum is theoretically available in this Court, by writ of certiorari. Quite obviously, however, this mode of review cannot be generally applied due to practical limitations. See *Stone* v. *Powell*, 428 U. S. 465, 526 (1976) (Brennan, J., dissenting).

418. In my view, that theory is profoundly wrong for several reasons.

First, it has its origin in a misreading of our early precedents. *Fay* interpreted the holding of *Ex parte Royall*—that federal courts had discretion not to entertain the habeas claims of state prisoners prior to the conclusion of state-court proceedings—as containing the implication that *after* conclusion of those proceedings there would be plenary federal review of *all* constitutional claims. 372 U. S., at 420. In fact, however, *Royall* had noted and affirmed the common-law rule that claims of error not going to the jurisdiction of the convicting court could ordinarily be entertained only on writ of error, not on habeas corpus. 117 U. S., at 253. See *Fay*, *supra*, at 453–454 (Harlan, J., dissenting). See also *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 255 (1973) (Powell, J., concurring). *Royall* contained no hint of a suggestion that a federal habeas court should afford state-court judgments less respect than federal-court judgments. To the contrary, it maintained the traditional view that federal and state courts have equal responsibility for the protection of federal constitutional rights. The discretion of the federal habeas court "should be exercised," it said, "in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States, . . . courts equally bound to guard and protect rights secured by the Constitution." 117 U. S., at 251. And in describing the proper disposition of a federal habeas petition filed after state conviction, *Royall* cited *Ex parte Lange*, 18 Wall. 163 (1874), which involved a federal habeas attack on a *federal* conviction. See 117 U. S., at 253. Thus, *Royall* is properly understood as saying that the federal habeas statute guaranteed state prisoners, not a federal forum for all their federal claims, but rather the same rights to federal habeas relief that federal prisoners possessed.

Worse than misreading case precedent, however, the federal right/federal forum theory misperceives the basic struc-

ture of our national system. That structure establishes this Court as the supreme judicial interpreter of the Federal Constitution and laws, but gives other federal courts no higher or more respected a role than state courts in applying that "Law of the Land"—which it says all state courts are bound by, and all state judges must be sworn to uphold. U. S. Const., Art. VI. See *Robb* v. *Connolly*, 111 U. S. 624, 637 (1884); *Ex parte Royall, supra,* at 251; *Brown,* 344 U. S., at 499 (opinion of Frankfurter, J.). It would be a strange constitution that regards state courts as second-rate instruments for the vindication of federal rights and yet makes no mandatory provision for lower federal courts (as our Constitution does not). And it would be an unworkable constitution that requires redetermination in federal courts of all issues of pervasive federal constitutional law that arise in state-court litigation.

Absent indication to the contrary, state courts should be presumed to have applied federal law as faithfully as federal courts. See *Ex parte Royall, supra,* at 252; *Brecht* v. *Abrahamson, ante,* at 636. A federal court entertaining collateral attack against a state criminal conviction should accord the same measure of respect and finality as it would to a federal criminal conviction. As it exercises equitable discretion to determine whether the merits of constitutional claims will be reached in the one, it should exercise a similar discretion for the other. The distinction that has arisen in lower court practice is unsupported in law, utterly impractical and demeaning to the States in its consequences, and must be eliminated.

\*       \*       \*

While I concur in Part III of the Court's opinion, I cannot agree with the rest of its analysis. I would reverse the judgment of the Court of Appeals and remand the case for a determination whether, given that respondent has already been afforded an opportunity for full and fair litigation in the

courts of Michigan, any unusual equitable factors counsel in favor of readjudicating the merits of his *Miranda* claim on habeas corpus.