Filed 3/28/14  P. v. Hunter CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B246241 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA080857) |
| v. | |
| SAMUEL HUNTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Affirmed with directions.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Samuel Hunter was convicted, following a jury trial, of one count of shooting at an occupied motor vehicle in violation of Penal Code section[1] 246 and one count of being a felon in possession of a firearm in violation of section 12021, subdivision (a)(1). The jury found true the allegations that appellant personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c) and committed the offense for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b). The jury could not reach a verdict on the counts 1 and 2 murder and attempted murder charges. Those counts were retried. The jury found appellant guilty of second degree murder and attempted murder. The jury found not true the allegation that the attempted murder was willful, deliberate and premeditated. The jury found the section 12022.53 firearm allegations and the section 186.22 gang allegations true. Appellant admitted he had suffered a prior conviction for robbery, a serious felony within the meaning of section 667, subdivision (a) and sections 667, subdivisions (b) through (i) and 1170.12 (the "three strikes" law). The trial court sentenced appellant under the three strikes law to 55 years to life in prison for the murder conviction and related enhancement terms and 53 years in prison for the attempted murder conviction and related enhancement terms, for a total of 108 years to life in prison.

Appellant appeals from the judgment of conviction, contending the trial court erred in admitting his statements to police, imposing two five-year enhancements for one prior conviction and calculating his custody credit. He requests we order the abstract of judgment corrected to accurately reflect his presentence custody credits. Respondent requests we order the abstract of judgment corrected to reflect four $30 assessments pursuant to Government Code section 70373. We order the requested corrections made, as set forth in detail in our disposition. We affirm the judgment of conviction in all other respects.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Facts

On December 25, 2008, at about 9:00 p.m., Sarah Spartalis, her mother Denise Spartalis and her boyfriend Brett were in a car stopped at the intersection of Senator Avenue and 255th Street in Los Angeles County. Sarah and Brett heard popping noises which sounded like gunshots. Sarah and Denise saw three men run across Senator Avenue from the direction of the gunshots. The third man was about 20 feet behind the other two men. As he crossed in front of the Spartalis car, he slowed down and looked at the car. Sarah and Denise were able to see his face. It was appellant.[2]

At about 9:30 p.m., police responded to a 911 call and found two gunshot victims on the ground near a red car in the alley south of 254th Street. Angela Willis, one of the victims, died from her gunshot wounds. The second victim, Olaju Ferguson, survived.

In late December 2008, appellant was shot in the neck while at a barbershop. He was hospitalized, then released on January 6, 2009. Officer Fernando Rivas and Detective Benavides took appellant from the hospital to the police station, where they questioned him for at least four hours about the December 25 shooting. Appellant essentially said he left his house with two fellow gang members but did not follow them into the alley, then he heard shots and when the men ran by him he followed. After the interview, Officer Rivas advised appellant and his mother, Samantha Graham, to go to Riverside because it was too dangerous for them to stay in Harbor City.

Appellant went to his father's home in Riverside. Police interviewed him there on January 12 and 14, 2009. On January 21, 2009, police took appellant from his father's home to the Harbor City police station. They advised him of his *Miranda*[3] rights and interviewed him again. After the interview was concluded, appellant spoke with his

---

[2]     A week or two after the shooting, Sarah and Denise selected appellant from a photographic line-up as the man they saw on Christmas night. They also identified appellant in court.

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

3

mother and his mentor Mitchell Gardner in the interview room. The conversation was videotaped. Appellant was arrested.

At the first trial, the prosecutor did not introduce any evidence of the contents of the first three interviews. The prosecutor played the recording of the January 21 interview. During this interview, appellant said that Ferguson and Jerome Downs got into a fight prior to Thanksgiving 2008 and Ferguson beat up appellant on Thanksgiving. On Christmas Day 2008, appellant was at home with his girlfriend. Downs and his friend Trevon came over. Downs wanted appellant to go the liquor store with them. When appellant refused, they roughed him up, pulled guns on him and forced him to walk outside, down the street and into the alley near the intersection of 255th Street and Senator Avenue. At the mouth of the alley, Trevon gave appellant a gun. Appellant stood next to the front fender of the red car, and Downs and Trevon started shooting. Appellant fired one shot, toward Belle Porte Avenue and away from the car. His gun jammed. As the men left, Trevon took appellant's gun, then hit appellant. They ran back to appellant's apartment. When Downs and Trevon realized the gun used by appellant had jammed, they beat him up. Appellant marked the locations of the three men during the shooting on a diagram. He showed himself standing on the front passenger side, Trevon in front of the car and Downs behind the car.

The prosecutor also played the videotape of appellant's conversation with his mother and Gardner which took place after the January 21 interview. Appellant gave virtually the same account of the shooting to his mother and Gardner as he had just given to police.

A ballistics expert testified that tests showed three guns were fired at Willis and Ferguson: two .9 mm guns and a .380 revolver. A forensic expert testified about the bullets' trajectories, which were all fired from behind the victims' car and from the left (driver's) side.

A gang expert testified that appellant and Downs were both members of the Harbor City Crips gang and had previously committed a robbery together. Given a

hypothetical based on the facts of this case, the expert opined that the crimes were committed for the benefit of a criminal street gang.

Appellant testified in his own behalf at trial and gave an account of events at Thanksgiving and Christmas 2008 that was similar to the one he had given to police in the January 21 interview, with one key difference. At trial, appellant denied firing the gun at all. Appellant explained he initially told police (in the January 6 interview) that he did not shoot a gun, but then his father's house was broken into and he believed he was going to be killed by Downs or Trevon. Downs and Trevon had warned him not to tell anyone about the shooting or they would kill him. Thereafter, during the January 21 interview, he told the police he shot the gun toward Belle Porte Avenue. He did not really fire the gun. He believed that if he implicated himself in the shooting, Downs and Trevon would not think he was a snitch.

The jury convicted appellant of one count of shooting at a motor vehicle and one count of being a felon in possession of a firearm, but could not reach a verdict on the murder and attempted murder charges.

The People retried appellant on the murder and attempted murder charges. At this trial, the prosecutor introduced evidence of the contents of appellant's January 6 interview, in which appellant initially denied being involved in the Christmas shooting. When told during that interview that eyewitness identification put him at the scene, appellant said he left his house with Downs and Trevon, but did not follow them down the alley. He heard gunshots, and when Downs and Trevon ran by, he followed. He did not fire a gun.

The prosecutor again introduced evidence of the contents of appellant's January 21 interview, which differed significantly from that of the January 6 interview. Officer Rivas testified that in the January 21 interview appellant said he followed Trevon and Downs into the alley after they hit and threatened him. Trevon gave appellant a gun as they entered the alley. Downs and Trevon fired their guns. Appellant fired one shot, but not at the car. Trevon took the gun back from appellant, saw there were no bullets fired and hit appellant. Back at appellant's apartment, Downs and Trevon beat up appellant.

5

The prosecutor introduced more extensive ballistics and trajectory expert evidence at the second trial. The ballistics evidence showed the two .9 mm guns each fired multiple bullets. Only one round fired by the .380 revolver was recovered. That round was found by the coroner in the victim's body. The trajectory expert explained that all the shots fired at the victim's car came from the rear and the left of the car. If a person were standing on the front passenger side, he or she would be in the line of fire.

Appellant again testified in his own behalf. His account of events leading up to the Christmas shooting, and the shooting itself was very similar to his account at the first trial. Appellant added that he did not see Willis and Ferguson in the car. He repeated that he did not fire the gun. He told police he fired the gun because that meant he was not snitching on Downs and Trevon.

Appellant also testified about the circumstances of his January 6 interview with police, explaining he was on pain medication, and was tired and in pain. Appellant did not want to say anything to police about the shooting because he did not want to be considered a snitch and killed. The interview lasted until 3:00 a.m., and appellant fell asleep on the ground at one point. At the end of the interview, detectives told him they would put him and his family in the witness protection program

Appellant's mother and Gardner again testified on appellant's behalf. Appellant's mother was in New York when she heard appellant had been shot. She returned and visited him in the hospital. Police took appellant from the hospital to the police station at about 5:00 p.m. The police did not finish questioning appellant until 3:00 a.m. The first time appellant spoke to her about the Christmas shooting was after the January 21 interview with police. He told her he was beaten up by Downs and Trevon, given a gun and then shot the gun because Downs and Trevon were looking at him. He fired the gun towards Belle Porte Avenue, not the car. Downs and Trevon checked the gun, saw that it did not fire and beat him.

Gardner acknowledged appellant told him that he had shot a gun at the Christmas shooting, but fired away from the car.

6

Discussion

1. Statements to police

Appellant was interviewed by police four separate times between January 6 and 21, 2009. Before the first trial, appellant moved to suppress the January 21 statement on the ground that it was tainted by coercive tactics used at the first three interviews.[4] Appellant contends the trial court failed to apply the correct standard in ruling on his motion to suppress evidence and so his statements to police were improperly admitted at trial, violating his Fifth Amendment privilege against self-incrimination and right to due process.

Courts look to the totality of the circumstances to determine if a confession was voluntary. (*Withrow v. Williams* (1993) 507 U.S. 680, 693 [113 S.Ct. 1745, 123 L.Ed.2d 407].) Factors to be considered when applying the totality of the circumstances include police coercion, the length and continuity of the interrogation, and the suspect's maturity, education, physical condition and mental health. (*People v. Massie* (1998) 19 Cal.4th 550, 576.) "[W]here – as a result of improper police conduct – an accused confesses, and subsequently makes another confession, it may be presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having 'let the cat out of the bag by confessing.' [Citations.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 359.) This presumption is rebuttable, "with the prosecution bearing the burden of establishing a break in the causative chain between the first confession and the subsequent confession." (*Ibid.*) Generally, this " requires at least an intervening independent act by the defendant or a third party to break the casual chain in such a way that the second confession is not in fact obtained by exploitation of the illegality." (*Id.* at p. 360.) Indications of attenuation include whether the defendant was *Mirandized* at the start of the second interview, the time between the two interviews, the continuity of

_____

[4] Appellant initially moved to suppress all four interviews, but the prosecutor represented he would only use the January 21 interview at trial. Thus, the trial court only ruled on the January 21 interview. The prosecutor did introduce evidence of the January 6 interview at the second trial. Appellant did not object to the introduction of that evidence.

7

personnel between the two interviews, any attempts to exploit information obtained from the first interview in the second interview, whether the defendant was mature and sophisticated, and the defendant's purpose in making his statements in the second interview. (*Id*. at p. 361.)

The standard of review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Here, the trial court ruled: "As long as we're just talking about the final interview and not any prior interviews, I believe from the totality of the circumstances test the discussions are free and voluntary and there is no evidence of coercion and I will permit this."

Appellant contends the trial court's statement shows the court failed to consider the first three interviews as part of the totality of the circumstances affecting the voluntariness of the last interview. There is some ambiguity in the court's statement. In the context of the hearing as a whole, the trial court's statement can be reasonably understood as confining its ruling on admissibility to the last interview, but basing that ruling on the totality of the circumstances, including the prior interviews.

The trial court's brief statement does not however indicate the factual findings upon which the court based its ruling. Appellant testified at the hearing on the motion to suppress about the circumstances of the four interviews and how he felt during those interviews. He claimed, for example, to have still been in pain and on medication at the time of the January 6 interview. The court might have found appellant's testimony credible and found the first interview(s) involuntary, but found any taint from the first interview attenuated by intervening facts, including the fact that appellant was not in custody between the January 6 and January 21 interviews. The court might also have

8

found appellant not credible and found all four interviews voluntary.[5] We need not speculate on the court's factual findings, however, because even if the court erred in finding the last interview admissible, any error would be harmless beyond a reasonable doubt. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 296 [111 S.Ct. 1246, 113 L.Ed.2d 302] [federal harmless error standard applies to erroneous admission of confession obtained in violation of Fifth Amendment].)

The evidence against appellant was overwhelming even without his statements to police. Two eyewitnesses heard gunshots and identified appellant as one of three men running from the direction of the gunshots. Both witnesses identified appellant in a six-pack photographic line-up and in court.

Appellant spoke with his mother and Gardner after the January 21 police interview, and made virtually the same statements to them as he had made to police. The conversation was video-taped and played for the jury at the first trial. At the second trial, appellant's mother and Gardner testified about the contents of appellant's statements to them. Thus, the jury in the second trial heard from witnesses sympathetic to appellant that appellant had admitted to going to the shooting site with Trevon and Downs, and to firing a single shot.

The forensic evidence against appellant contradicted the exculpatory aspects of appellant's statements and testimony. Appellant claimed to have fired only one shot, and to have fired it away from the car. The two .9mm guns each fired multiple shots. Only one bullet fired from the .380 revolver was recovered. It was found by the coroner in the victim's body. Thus, either appellant fired more than one shot, or he fired that single shot toward the car and hit the victim. Further, appellant claimed to have stood at the front of the car, closer to the passenger side. Trajectory analysis showed that all the bullets were fired from the rear toward the front of the car and from the left (driver's) side toward the right (passenger's) side. There was expert testimony that if appellant had been at the

---

[5] Given that portions of the January 6 interview were admitted at appellant's second trial, the trial court may have found that interview voluntary.

9

front of the car on the passenger side as he claimed, he would have been in the line of fire.

Expert gang evidence showed that appellant and Downs were members of the same gang. Appellant's Thanksgiving encounter with Ferguson provided a motive for the shooting. The gang evidence strengthened that motive.

Appellant points out the United States Supreme Court has stated that "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative evidence that can be admitted against him . . . .'" (*Arizona v. Fulminante, supra,* 499 U.S. at p. 296.) Here, however, appellant's statement to police is more properly viewed as an admission rather than a confession, as he claimed that he was coerced into going with Downs and Trevon, and did not shoot at the car. Further, under the somewhat unusual circumstances of this case, appellant's confession *is* like other evidence – it is like his statements to his mother and his mentor, which were captured on videotape. Thus, we do not view appellant's last interview as the most probative evidence in this case.

### 2. Section 667, subdivision (a)(1) enhancement

The trial court sentenced appellant to a term of 15 years to life in prison for the murder conviction, doubled pursuant to the three strikes law and the high term of 9 years in prison for the attempted murder conviction, also doubled pursuant to the three strikes law. The court added a five-year enhancement pursuant to section 667, subdivision (a)(1) to both of those sentences. The enhancement was based on a single prior conviction, and appellant contends that it could only be imposed on one count.

Appellant acknowledges the Fourth District Court of Appeal has held to the contrary in *People v. Misa* (2006) 140 Cal.App.4th 837 (rev. denied 10-11-06) ("*Misa*"). In that case, the Fourth District held that a section 667, subdivision (a) enhancement should be applied individually to each count of a sentence under the three strikes law, even though that enhancement is based on a single prior conviction. (*Id*. at p. 847.) The defendant in *Misa* was a second strike offender and received an indeterminate term,

doubled pursuant to the three strikes law and a determinate term, also doubled.  Appellant contends that *Misa* is wrongly decided and improperly extends the Supreme Court's holding in *People v. Williams* (2004) 34 Cal.4th 397 ("*Williams*").  The sentence in *Williams* was a third strike sentence and thus an indeterminate term.  Appellant contends the reasoning of *Williams* is only applicable to defendants who receive an indeterminate sentence under the three strikes law and not to second strike defendants who receive a determinate term.

We agree that the holding of *Misa* is an extension of the holding in *Williams*, but we see no error in that extension.  We decline appellant's invitation to disagree with *Misa*.


### 3.  Presentence custody credits

The trial court awarded appellant 1440 days of custody credit.  Appellant contends, and respondent agrees, that appellant is entitled to credit for 1451 days in custody prior to sentencing.  We agree as well.

Appellant was arrested on January 21, 2009 and sentenced on January 10, 2013.  He is entitled to credit for the day of arrest, the day of sentencing and all days in between.  (*People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.)  Accordingly, we order the abstract of judgment amended to reflect the correct number of days.  (See *People v. Jones* (2012) 54 Cal.4th 1, 89; *People v. Mitchell* (2001) 26 Cal.4th 181, 185-188.)


### 4.  Criminal conviction assessments

Respondent contends that the abstract of judgment should be corrected to reflect four $30 assessments pursuant to Government Code section 70373, subdivision (a)(1).  Appellant does not dispute that he was convicted of four counts to which the assessment may apply.  Accordingly, we will order the abstract of judgment corrected.

Disposition

The abstract of judgment is ordered corrected to show that appellant has 1,451 days of custody credit and to reflect four $30 assessments pursuant to Government Code section 70373, subdivision (a)(1). The clerk of the superior court is instructed to prepare an amended copy of the abstract of judgment reflecting these changes and to deliver a copy to the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MINK, J.[*]

We concur:

TURNER, P.J.

MOSK, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.