FILED
COURT OF APPEALS
DIVISION II

2014 JUL 15 AM 10: 41

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ALFRED JOSEPH SANCHEZ,<br><br>Appellant. | No. 42964-1-II<br><br><br><br>UNPUBLISHED OPINION |

MAXA, J. — Alfred Sanchez appeals his bench trial conviction for first degree assault with a deadly weapon for stabbing a person with a knife during a fight outside a bar in Olympia. He argues that (1) the trial court erred in denying his motion to suppress statements he made to investigating officers, (2) his waiver of his right to a jury trial was invalid, (3) the evidence was insufficient to support his conviction, and (4) his counsel was ineffective for a number of reasons.

We hold that (1) the trial court properly denied Sanchez's suppression motion because his statements were voluntary even though his military superior ordered him to cooperate with investigating officers; (2) Sanchez's jury trial waiver was made knowingly, intelligently, and voluntarily because he submitted a written waiver and the trial court engaged in two colloquies with him regarding his rights; (3) the trial court's unchallenged findings and findings supported by substantial evidence are sufficient to sustain Sanchez's conviction; and (4) Sanchez fails to show how his counsel's performance was deficient. We affirm.

FACTS

*Stabbing Incident*

On the evening of March 27, 2009, a group of Fort Lewis soldiers, including Sanchez, went to Charlie's Tavern in downtown Olympia. Bradley Merten also was at the bar that night with a group of friends. Merten's friends had an argument with some of the soldiers outside the bar, and as Merten and his friends were walking to their car after leaving the bar, Merten's friends and the soldiers began fighting. Merten felt as though he had been punched in the back and, when he turned around to see who had punched him, he saw a man in a black hat and a black jacket standing on the other side of a car. When Merten asked the man if he had punched him, the man ran away. Merten later identified the man as Sanchez.

Merten realized he had actually been stabbed, not punched, and he was taken to the hospital. Merten's stab wound injuries included a partially collapsed lung, a fractured rib, and a laceration on his liver.

An Olympia police officer questioned Merten at the hospital. Merten stated that the person who had stabbed him was a white male wearing a black North Face jacket and black baseball cap. He said that he recognized the individual from seeing him talk to his friends outside the bar and he knew that the individual had been removed from the bar because he had kicked in the back door. The detective showed Merten a photomontage containing Sanchez's photo, but Merten could not identify the person he saw. On April 1, 2009, the detective showed Merten a second montage containing Sanchez's photo, and Merten identified Sanchez.

2

42964-1-II

*Sanchez's Statements to Detectives*

Because many of the participants in the fight had left by the time detectives arrived, Olympia police detectives went to Fort Lewis to further investigate. The involved soldiers' commanding officer stated that he ordered them "to cooperate with and be interviewed by local law enforcement." Clerk's Papers (CP) at 40. The commanding officer further stated that he "made it very clear to them that they were being ordered to do whatever the police asked them to do, including giving a statement regarding participation in the events that had transpired earlier that morning." CP at 41. The detectives questioned each involved soldier individually in the barracks.

Before interviewing Sanchez, one of the detectives informed him of his *Miranda*[1] rights. Sanchez acknowledged that he understood his rights and agreed to waive them. The detective then asked Sanchez to give a recorded statement. On the recording, the detective stated that Sanchez had been informed of his rights earlier. The detective then asked Sanchez if he understood his rights, and he responded, "Yes." The detective asked if Sanchez was willing to speak to him, to which Sanchez also responded, "Yes." The detective then read Sanchez his *Miranda* rights again on the record, again asked if he understood those rights, and again asked whether he wanted to speak to the officers. Sanchez responded in the affirmative. Sanchez proceeded to give a recorded statement to the detective in which he expressly denied stabbing

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3

Merten. The State charged Sanchez with first degree assault while armed with a deadly weapon.[2]

*Motion to Suppress and First Trial*

Sanchez moved under CrR 3.5 to suppress statements he had made to the police officers arguing that they were involuntary because his superior military officer had ordered him to cooperate. The trial court denied the suppression motion. The court found that Sanchez was not in custody when the statement was made. The court further ruled that Sanchez was read his *Miranda* rights and that his superior officer's direct order to cooperate with the police did not render the questioning improper. At that time the trial court did not enter findings of fact or conclusions of law supporting its ruling.

Sanchez's first trial was before a jury, which was unable to reach a verdict. The trial court declared a mistrial. The State again charged Sanchez with first degree assault while armed with a deadly weapon. The case again was set for trial.

*Motion to Waive Jury Trial*

Sanchez moved to waive his right to a jury trial. In support of the motion, Sanchez's counsel argued that it had been two years since the original jury trial and none of the service members present on the night of the stabbing were available to testify. Therefore, she stated, "[I]n order to accurately portray this story . . . we'd be reading 10, 15 transcripts into the record, and it's my concern that we'd lose the jury." Report of Proceedings II (RPII) at 21. She further expressed concern that "the jury not having seen those witnesses . . . how they presented themselves, how they testified, it would be very difficult for them to judge the credibility of a

---

[2] The State also charged Sanchez with first degree burglary. However, the trial court later granted Sanchez's motion for a directed verdict on this charge and it was dismissed.

reading." RPII at 21. Sanchez's counsel argued that because the trial judge had been there during the first trial and had the opportunity to observe the witnesses testifying in person, it would be more likely that Sanchez would receive a fair trial if his case were tried to the judge who had originally observed the witnesses. She further stated that a bench trial was appropriate because "[a] lot of what the Court is going to be considering now is going to be legally technical information anyway." RPII at 22.

Sanchez's counsel informed the trial court that she had reviewed Sanchez's constitutional rights with him and that her "client well understands that he's . . . putting his future in the hands of one person. I've explained to him that there's no such thing as a hung judge." RPII at 22. Defense counsel further stated, "I have gone over the constitutional rights that my client would give up today." RPII at 18. Sanchez also submitted a written waiver of his right to a jury trial, stating that he was represented by counsel and waived his right to a jury trial as well as his right to have the jury decide the deadly weapon sentencing enhancement.

The trial court then reviewed Sanchez's rights with him. When asked by the trial court whether he understood that it was very unusual to waive the right to a jury, whether he had gone over with defense counsel what it means to waive this right, and whether he was waiving his right to have a jury decide the deadly weapon aggravating factor, Sanchez responded in the affirmative. The court also asked Sanchez how long he had discussed the jury trial waiver with counsel before making the decision, to which Sanchez responded, "A month or two." RPII at 26.

After taking a recess to consider the jury trial waiver issue, the trial court again discussed the issue with Sanchez, confirming that Sanchez understood that he was waiving his constitutional right to have 12 disinterested jurors try him and that he was waiving his right to

5

42964-1-II

have a jury decide the deadly weapon enhancement issue. The trial court then confirmed with Sanchez that he was not being coerced into waiving his right to a jury trial, that no one had made any promises in exchange for his waiver, and that he had discussed the matter multiple times with his attorney over the course of approximately one month. The trial court accepted Sanchez's motion to waive jury trial.

*Bench Trial and Conviction*

The case proceeded to trial before the court. The trial court found Sanchez guilty as charged. Sanchez appeals. We subsequently remanded to the trial court to enter findings of fact and conclusions of law from the CrR 3.5 hearing so that we could review the suppression issue on appeal.

## ANALYSIS

A.   FAILURE TO SUPPRESS SANCHEZ'S STATEMENTS

The trial court denied Sanchez's CrR 3.5 motion to suppress statements he made to investigating police detectives. Sanchez argues that the trial court erred in concluding that his waiver of his *Miranda* rights was knowing and voluntary. He argues that his statement was not voluntary because he was ordered by a military commanding officer to cooperate with the detectives. We disagree.

1.   Standard of Review

In reviewing a trial court's denial of a suppression motion, we determine whether substantial evidence supports the trial court's findings of fact and whether the findings support the conclusions of law. *State v. Ross*, 106 Wn. App 876, 880, 26 P.3d 298 (2001). We review conclusions of law de novo. *State v. Johnson*, 128 Wn.2d 431, 443, 909 P.2d 293 (1996).

6

A defendant is deprived of due process of law under the Fifth Amendment to the United States Constitution if his conviction is founded, in whole or in part, upon an involuntary statement. *Jackson v. Denno*, 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L.Ed.2d 908 (1964). The inquiry is whether, under the totality of the circumstances, the defendant's confession was coerced. *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363 (1997).

2.    Challenged Findings of Fact

Sanchez challenges all but two of the trial court's eight findings of fact on his CrR 3.5 suppression motion. However, the evidence presented at the suppression hearing clearly supports the findings relevant to our analysis: that Sanchez twice waived his *Miranda* rights. The detectives testified, and Sanchez agreed on cross-examination, that Sanchez was advised of his *Miranda* rights and expressly waived those rights both before he gave an oral statement and before he gave a recorded statement. Accordingly, we reject Sanchez's challenge to the trial court's factual findings regarding waiver.[3]

3.    Valid Waiver

Sanchez challenges the trial court's legal conclusion that the waiver of his *Miranda* rights was voluntary, arguing that his waiver could not be voluntary when his military superior ordered him to cooperate with the local civilian police. It is undisputed that a military superior ordered Sanchez to submit to an interview with Olympia Police Department detectives and to cooperate with them. But the trial court ruled that this fact did not mean that the waiver was involuntary. We agree with the trial court.

---

[3] Sanchez also challenges the trial court's factual finding and legal conclusion that he was not physically restrained, in custody, or under arrest at the time he gave the statements. But whether or not Sanchez was in custody is immaterial because he was advised of his *Miranda* rights.

A private party's conduct generally cannot render a statement inadmissible under the Fifth Amendment. *See State v. Unga*, 165 Wn.2d 95, 100-01, 196 P.3d 645 (2008) (holding that police coercion is a " 'crucial element' " when determining voluntariness) (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L.Ed.2d 407 (1993)).

> Because the Fifth Amendment protects a person from being compelled to give evidence against himself or herself, the question whether admission of a confession constituted a violation of the Fifth Amendment does not depend solely on whether the confession was voluntary; rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' ".

*Unga*, 165 Wn.2d at 100-101 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L.Ed.2d 473 (1986)). As a result, even outrageous behavior by a private party to force a statement does not make that statement inadmissible. *Connelly*, 479 U.S. at 166.

Here, there is no allegation that the detectives interviewing Sanchez engaged in coercive conduct to obtain Sanchez's statement. The only alleged coercive conduct came from a party unrelated to the detectives' investigation – Sanchez's military superior. Because there was no coercive police activity, Sanchez's waiver of his *Miranda* rights was voluntary even though his superior ordered him to cooperate. Accordingly, we affirm the trial court's denial of Sanchez's motion to suppress his statements.

B.    WAIVER OF JURY TRIAL

Sanchez argues that the trial court erred when it accepted his jury trial waiver. We disagree.

1.    Legal Principles

A criminal defendant may waive his constitutional right to a jury trial. *State v. Stegall*, 124 Wn.2d 719, 725, 881 P.2d 979 (1994). The State bears the burden of establishing the

validity of such a waiver. *State v. Cham*, 165 Wn. App. 438, 447, 267 P.3d 528 (2011), *remanded on other grounds*, 175 Wn.2d 1022 (2012). In order to uphold a jury trial waiver, the record must adequately establish that the defendant waived his right knowingly, intelligently, and voluntarily. *State v. Benitez*, 175 Wn. App. 116, 128, 302 P.3d 877 (2013). We review the validity of a defendant's jury trial waiver de novo. *Benitez*, 175 Wn. App. at 128.

CrR 6.1(a) provides: "Cases required to be tried by jury shall be so tried unless the defendant files a written waiver of a jury trial, and has consent of the court." Although a written waiver is not dispositive as to a defendant's jury trial waiver, a written waiver "is strong evidence that the defendant validly waived the jury trial right." *State v. Pierce*, 134 Wn. App. 763, 771, 142 P.3d 610 (2006). An attorney's representation to the court that the defendant's waiver is knowing, intelligent, and voluntary also is relevant evidence supporting the validity of a jury trial waiver. *Benitez*, 175 Wn. App. at 128. Unlike the waiver of other constitutional rights, a valid waiver of the jury trial right does not require an extensive colloquy on the record. *Benitez*, 175 Wn. App. at 128-29. Rather, only a personal expression of waiver from the defendant is required. *Pierce*, 134 Wn. App. at 771.

2. Valid Waiver

Here, when Sanchez moved to waive jury trial, his counsel informed the trial court that she had reviewed Sanchez's constitutional rights with him and that Sanchez understood those rights. Sanchez also submitted a signed, written waiver of his right to a jury trial, stating that he was represented by counsel and waived his right to a jury trial as well as his right to have the jury decide the deadly weapon sentencing enhancement. The trial court reviewed Sanchez's rights with him twice on the record and confirmed that Sanchez had discussed the matter extensively

with defense counsel. Only after two independent colloquies with Sanchez did the trial court accept his motion to waive his jury trial right. Sanchez's written waiver and two colloquies with the trial court were more than sufficient to constitute a knowing, intelligent, and voluntary waiver of his right to a jury trial.

Sanchez nevertheless argues that his waiver was invalid because there was no record of what he discussed with counsel. However, defense counsel stated on the record that she had reviewed Sanchez's rights with him and that she had explained to Sanchez the effect of having his case tried to only one party, explaining, "[T]here's no such thing as a hung judge." RPII at 22. Further, the trial court confirmed with Sanchez on two occasions that he had discussed the matter with counsel for at least one month preceding trial. Sanchez cites no authority supporting his contention that more explanation of what counsel discussed with him was required, and we are aware of none.

Sanchez also argues that his written waiver was inadequate because the waiver did not inform him that he had the right to a unanimous jury. But Sanchez submitted a waiver in this case, and the waiver provided that Sanchez was represented by counsel and that he was waiving his right to a 12-person jury to decide both the underlying offense and the enhancement. Sanchez provides no authority supporting his claim that the waiver itself was required to provide him any additional information.

Sanchez next argues that his waiver was inadequate because he was not advised that he was giving up the right to participate in jury selection. However, we have explicitly held that a defendant is not required to be informed of the right to participate in juror selection in order for his jury trial waiver to be valid. *Pierce*, 134 Wn. App. at 773.

Finally, Sanchez argues that the waiver was invalid because he was not advised of his statutory right to have a different judge hear the case. But again Sanchez fails to cite any authority stating that this was required, and "we have not required that a defendant be apprised of every aspect of the jury trial right in order for the defendant's waiver to be valid." *Benitez*, 175 Wn. App. at 129.

We hold that the record supports Sanchez's knowing, intelligent, and voluntary jury trial waiver.

C.    SUFFICIENCY OF THE EVIDENCE

Sanchez challenges many of the trial court's findings of fact and argues that the evidence was insufficient to support his conviction. We disagree.

1.    Legal Principles

Evidence is sufficient to support a conviction if after viewing the evidence and all reasonable inferences from it in a light most favorable to the State, a rational trier of fact could find each element of the crime proved beyond a reasonable doubt. *State v. Higgs*, 177 Wn. App. 414, 436, 311 P.3d 1266 (2013), *review denied*, 179 Wn.2d 1024 (2014). A claim that the evidence was insufficient admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

A challenge to the sufficiency of the evidence presented at a bench trial requires us to review the trial court's findings of fact and conclusions of law to determine whether substantial evidence supports the challenged findings and whether the findings support the conclusions.

*State v. Homan*, 172 Wn. App. 488, 490, 290 P.3d 1041 (2012), *review granted*, 177 Wn.2d 1022 (2013). Evidence is substantial if it is sufficient to convince a fair-minded, rational person of the finding's truth. *State v. McEnry*, 124 Wn. App. 918, 924, 103 P.3d 848 (2004). Unchallenged findings of fact are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review the trial court's conclusions of law de novo. *Homan*, 172 Wn. App. at 490.

2.    Challenged Findings of Fact

Sanchez challenges many of the trial court's findings of fact in his assignments of error, but does not provide briefing supporting findings 5, 7, 8, 11, 12, 15, 16, 17, 18, 23, 26, 27. Accordingly, those assignments of error are waived. RAP 10.3(a)(6); *see also Thomas*, 150 Wn.2d at 874 (absent supporting argument or citations to relevant authority, an assignment of error is waived). Sanchez also challenges finding of fact 21 in his briefing but does not include that finding in his assignments of error. Accordingly, we also decline to review that challenge. RAP 10.3(g). We address each of Sanchez's remaining, properly challenged findings of fact to determine whether they are supported by substantial evidence.

a.    Finding of Fact 3

Sanchez challenges the portion of the trial court's Finding of Fact 3 that provides that Merten's "injuries, without immediate medical intervention, were life-threatening." CP at 706. Sanchez argues that the physician who admitted Merten to the hospital "did not believe [Merten's] injuries created a probability of death." Br. of Appellant at 56. But Sanchez's contention is directly contradictory to the testimony. In response to the question whether Sanchez's injuries, if left untreated, were life-threatening, the physician answered, "Yes." The

12

trial court's Finding of Fact 3 is almost a direct quote from this statement, and therefore it is clearly supported by the evidence.

b. Finding of Fact 6

A cook from Charlie's testified that one of the knives that normally was on a magnetic hanger in the kitchen was missing, but that he had seen it when he left the bar on the evening of March 27. Sanchez challenges Finding of Fact 6, which provides: "The missing knife appears consistent with the width of the stab wound received by Mr. Merten." CP at 707. Sanchez notes that the physician who treated Merten at the hospital testified that the length of the stab wound was approximately 1.9 inches across. The physician stated that he did not know the depth of the wound with certainty, but estimated that it would have been approximately 6 inches. The record shows that the knife taken from the kitchen had a 5-inch handle and a 5-inch blade and was approximately one and a half inches wide. Because the estimates of the width and depth of Merten's wound were approximations, the trial court reasonably could have concluded that the dimensions of the knife taken from the kitchen were consistent with Merten's wounds.

Sanchez also appears to argue that the finding was unsupported because although there was evidence that the knife taken from the bar was extremely sharp, the stab wound was "ragged." Br. of Appellant at 57. But the testimony Sanchez cites discusses the nature of the cuts in the fabric of Merten's T-shirt, not the nature of the body wound. Further, the witness explained that the nature of that cut likely was caused by fabric being pulled against the knife in a struggle. The testimony said nothing about the tears in the shirt being inconsistent with the type of knife used. Merten's treating physician testified that the nature of the wound gave reason

13

to believe that it was caused by a sharp object, consistent with a knife wound. The finding was supported by substantial evidence.

c.    Findings of Fact 9 and 10

The State introduced video surveillance footage into evidence that, according to the State's expert, depicted Sanchez walking through the kitchen. The expert testified that as Sanchez walked through the kitchen, he reached toward the area where the knives were kept and that his hand moved toward his rear pocket. Sanchez challenges Finding of Fact 9, which provides:

> Surveillance video shows the defendant in the kitchen and his left hand going up to where the knives are stored and where the missing knife is described as being earlier in the evening. The video then shows a knife going into the defendant's back left pocket. The video further shows that as the defendant enters the tavern from the kitchen, he is pulling down the left side of his shirt.

CP at 707. He also challenges Finding of Fact 10, which provides: "The defendant did take the missing knife from the kitchen." CP at 707.

The video played to the trial court is not in the record before us on appeal. However, the State hired a video expert to examine the video and he testified about his findings at trial while playing the video for the trial court. The expert stated that he saw Sanchez's feet move into the kitchen area in front of where the knives were kept and that Sanchez moved forward and his jacket on his left side raised upwards. Sanchez's left hand then became visible and there was a thin reflective object in his hand as he moved his hand toward his rear left pocket. He then took hold of his jacket and pulled the jacket down over his rear left pocket. The expert identified Sanchez as the individual in the video by his clothing description and his position in the video. This testimony is consistent with the trial court's findings.

14

Sanchez states that the trial court's findings that he took the knife were unsupported because there was testimony that "some force was required to remove the knives from the magnetic strip" in Charlie's kitchen. Br. of Appellant at 60. However, he does not cite any evidence that the force allegedly required to take the knife from the magnetic strip would have affected his ability to take the knife as shown by the video. Sanchez also argues that the findings were unsupported because the knife was so sharp that it was unlikely that someone would place it in his pants pocket without "at a minimum some torn trousers and at a maximum some severe physical discomfort and injury. Mr. Sanchez did not evince either." Br. of Appellant at 60. But again, Sanchez provides no citations to the record supporting his claim.

Sanchez further argues that the findings were not supported by substantial evidence because the surveillance video shows only his lower leg and shoes as he walks in the kitchen. But without the aid of the video, we must rely on the expert's testimony which stated that he could conclude the actor in question was Sanchez by the clothes he was wearing and his position. Accordingly, the trial court's finding regarding what took place on the video was supported by substantial evidence, and this further supports the trial court's finding that Sanchez took the knife from the kitchen.

d.   Finding of Fact 13

Sanchez challenges the trial court's Finding of Fact 13, which provides that Thomas Gallagher, a service member who was present at Charlie's, confirmed Sanchez's presence while a group of military service members were leaving the bar as the fight started. Sanchez claims that this finding "eludes appellate review" because it "cannot be determined at what time Mr. Gallagher confirmed Mr. Sanchez to be present." Br. of Appellant at 61.

15

42964-1-II

Gallagher testified that he was with Sanchez at Charlie's on March 27, 2009. He testified that as he and a friend were leaving the bar, Sanchez and Melville were approximately 15 to 20 meters behind him. Gallagher stated that a crowd of people then came out of the bar and a fight broke out. He testified that the last time he saw Sanchez was when he was walking behind him leaving the bar with Melville. Contrary to Sanchez's assertion that it was unclear when Gallagher confirmed Sanchez to have been present, Gallagher clearly stated the last point at which he saw Sanchez and this testimony in turn supports the trial court's finding that Sanchez was outside the bar when the fight started. Accordingly, Finding of Fact 13 was supported by substantial evidence.

e.    Finding of Fact 14

Sanchez challenges Finding of Fact 14, which provides, "The defendant was the only one not accounted for once the fight started. All of the other participants were either fighting or leaving." CP at 707. Sanchez claims that the record shows that "Sanchez was trying to leave and making efforts to find a ride back to the base." Br. of Appellant at 61. In support of this contention, he cites testimony regarding repeated phone calls Sanchez made on his cellular phone after the fight broke out.

But the testimony supports the trial court's conclusion that the individuals present when the fight broke out were either participating in the fight or leaving the scene, and that no one could account for where Sanchez was at that time. Gallagher testified that he was on his way back to his car when the fight broke out, and that he saw Melville walking in the street after the fight but did not see Sanchez. He further testified that Jason Britt left the bar with him and was

16

standing with him by his car when the fight took place. He testified that he waited by his car for his friends and Britt went back into the bar.

Wesley Sims, another service member at the bar that night, testified that the fight already had started when he and Justin Spangler left the bar. He testified that Abraham Zenker had pulled his car in front of the bar by that time and that he, Melville, Zenker, Andrew Thomas, and Jim Elmer rode away together. There was no testimony regarding Sanchez either being involved with the fight or leaving with the others. Accordingly, the finding was supported by substantial evidence.

### f. Findings of Fact 19 and 20

Sanchez challenges the trial court's Findings of Fact 19 and 20, which provide:

19. Mr. Merten . . . describes his attacker as having a medium-build, being 5'8", weighing approximately 155 pounds, wearing a black hat and black jacket, and identifies him as the defendant. In August of 2009, in an interview with Mr. Fred Doughty, Mr. Merten described the stabber as having gelled hair.

20. The victim's testimony and identification of the defendant as his attacker was credible.

CP at 708.

As to Finding of Fact 19, Sanchez appears only to challenge the portion of the finding stating that Sanchez was wearing "a black hat and black jacket," arguing only that "[t]he trial court failed to resolve Merten's inconsistent descriptions of his assailant's clothing." Br. of Appellant at 61. But Merten did testify that Sanchez was wearing a black hat and black jacket on the night in question. This finding is supported by the record. We do not re-weigh evidence or assess witness credibility, and therefore we do not consider Sanchez's argument that the trial court should have considered any allegedly inconsistent testimony when the record clearly

supports the finding. *Thomas*, 150 Wn.2d at 874-75. Similarly, because we do not evaluate witness credibility, we decline to address Sanchez's challenge to the trial court's finding that Merten was credible.

g.     Finding of Fact 24

Sanchez challenges the trial court's Finding of Fact 24, which provides: "The entire fight from start to finish, including the stabbing and the chase, occurred within two to three minutes, from approximately 1:22 to 1:25 am." CP at 708. He argues that the record shows that Sanchez was on his telephone at 1:24 a.m. and therefore could not have been involved in the fight or resultant stabbing.

Sanchez is correct that his phone records showed that he made a call at 1:24 a.m. But Sanchez fails to show that this fact disproves the trial court's finding regarding the time at which the fight took place. Further, this fact does not mean that Sanchez was not involved in the fight, as Sanchez claims, because he could have engaged in the fight during the first two minutes of the fight and subsequently made a phone call. Accordingly, this finding was supported by substantial evidence.

h.     Finding of Fact 25

Sanchez challenges the portion of the trial court's Finding of Fact 25 that provides that after the stabbing Sanchez "was picked up by a cab far away in a desolate place, a darkened alleyway in a residential neighborhood, approximately one mile away." CP at 708. He argues that the finding is not supported because the cab driver picked Sanchez up on a public street in a residential neighborhood in Olympia, and that there was insufficient evidence that he picked Sanchez up in an alleyway. The cab driver testified that he picked Sanchez up in a residential

area east of downtown Olympia. He further testified that Sanchez came out of an alley when he picked him up. This finding was supported by substantial evidence.

3.   Sufficiency of the Evidence

Sanchez argues that the evidence was insufficient to support the trial court's conclusions regarding (1) the assailant's identity, (2) intent, and (3) great bodily harm. We disagree.

The trial court found Sanchez guilty of first degree assault under RCW 9A.36.011, which provides:

> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
>     (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or . . .
>     (c) Assaults another and inflicts great bodily harm.

Sanchez argues that the State failed to prove the assailant's identity because it did not provide evidence of a photo montage and because there were differing descriptions of the assailant at the hospital. But Sanchez does not provide any support for his assertion that the State was required to provide a photo montage and does not cite the portion of the record in which the allegedly differing descriptions are located. Further, the trial court's findings regarding Sanchez's identity were supported by substantial evidence.

Sanchez's argument regarding intent merely states, "No evidence of intent." Br. of Appellant at 65. He does not tie the argument in to his challenges to the findings of fact and does not provide any citation to legal authority regarding the State's requirement to prove intent.

Sanchez's argument on great bodily harm provides only that "medical testimony is dispositive here." Br. of Appellant at 65. He cites no legal authority and does not explain why the findings do not support this conclusion. " 'Great bodily harm' means bodily injury which

19

creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." Former RCW 9A.04.110(4)(c) (2007). The trial court's supported finding provides that Sanchez's injuries were life-threatening without immediate medical intervention. This finding supports the trial court's conclusion that Sanchez inflicted great bodily harm on Merten.

D.   INEFFECTIVE ASSISTANCE OF COUNSEL

Sanchez argues that his trial counsel was ineffective for a number of reasons, none of which have merit.

   1.   Legal Principles

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on an ineffective assistance of counsel claim, the defendant must show both (1) that defense counsel's representation was "deficient," and (2) that the deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). The failure to show either element ends our inquiry. *Grier*, 171 Wn.2d at 33. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have been different. *Grier*, 171 Wn.2d at 34.

We give great deference to trial counsel's performance and begin our analysis with a strong presumption that counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33. A claim that trial counsel provided ineffective assistance does not survive if trial counsel's conduct

42964-1-II

can be characterized as legitimate trial strategy or tactics. *Grier*, 171 Wn.2d at 33. To rebut the strong presumption that counsel's performance was effective, "the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 42 (emphasis omitted) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

2.   Failure to Admit Photo Montage

At the bench trial, defense counsel entered into evidence the first photo montage in which Merten could not identify Sanchez. At the jury trial, defense counsel successfully had moved to exclude the second photo montage in which Merten did identify Sanchez. Sanchez now argues that his counsel should have moved to *admit* the positive identification and photo montage into evidence at the bench trial. The trial court originally excluded the montage as too suggestive because it pictured Sanchez on a lighter background than all of the other photos. Sanchez argues that because the second montage was so suggestive, it would have shown that "Merten had no real independent recollection and had to [be] impermissibly reminded of the identity of his assailant." Br. of Appellant at 67 (internal quotation marks omitted).

We hold that Sanchez's argument fails because it was clearly a tactical decision for trial counsel to not have wanted to admit evidence of a positive identification of Sanchez as the assailant. *See Grier*, 171 Wn.2d at 33.

3.   Advising Sanchez to Waive Jury Trial

Sanchez argues that his counsel was ineffective for advising Sanchez to waive his right to a jury trial because counsel incorrectly determined that the trial court could evaluate witness credibility based on the previous trial over which the same judge presided. Sanchez is correct

that his counsel argued to the trial court that one of the reasons it should accept the jury trial waiver was because the trial court had already heard the witnesses' testimony from the first trial, had observed their demeanor, and the jury in the new trial would not have that benefit. However, defense counsel also stated that she was concerned that she would "lose the jury" by having to read the transcripts into the record. RPII at 21. We hold that this was a legitimate tactical concern and does not support a claim for ineffective assistance. *See Grier*, 171 Wn.2d at 33.

4. Failure to Request Limiting Instruction

Sanchez argues that his counsel was ineffective for failing to request a limiting instruction to limit the State's use of his statement to police only for impeachment. But Sanchez fails to cite any legal authority in support of his argument that a limiting instruction would have been appropriate. And even if the evidence supported a limiting instruction, we presume that defense counsel did not request one in order to avoid reemphasizing any damaging evidence. *State v. Dow*, 162 Wn. App. 324, 335, 253 P.3d 476 (2011). Further, Sanchez fails to show how a limiting instruction would have been useful in a bench trial. *See State v. Melton*, 63 Wn. App. 63, 68, 817 P.2d 413 (1991) (we presume that the trial court disregards inadmissible matters). Accordingly, because Sanchez has shown neither deficient performance nor prejudice, his argument fails.

5. Failure to Secure Witness for Trial and Failure to Admit Statements

Sanchez argues that his counsel was ineffective for failing to secure Andrew Thomas as a witness because he had sent text messages linking him to the assault. He argues that Thomas should have been called as a witness because of two potentially inculpatory text messages he sent to friends near the date of the incident. One message read: "I guess there's a point in every

22

young man's life when he's a suspect in a stabbing incident." RPII at 1655 (internal quotation marks omitted). The other provided: "Apparently we were stabbing suspects. I dropped some big ass 'roid abuser with a huge left hand." RPII at 1656. Sanchez argues that because the case was one of general denial and misidentification, evidence of other suspects was particularly important to the case. Further, Sanchez argues that his counsel should have moved to admit the statements under ER 804(b)(3).

But Thomas's text messages *were* admitted at trial, over the State's objection. Moreover, defense counsel raised the possibility of Thomas as a suspect in closing arguments. Finally, there is no evidence supporting Sanchez's contention that counsel failed to investigate Thomas's whereabouts. Accordingly, Sanchez has failed to show how he was prejudiced and his claim fails.

We affirm Sanchez's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

HUNT, J.

BJORGEN, A.C.J.